IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS — EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 14-41230 |
| HORIZON GROUP MANAGEMENT, LLC, | ) | |
| | ) | Chapter 7 |
| _____Debtor._____ | ) | |
| ANDREW J. MAXWELL, trustee for the | ) | |
| estate of Horizon Group Management, LLC, | ) | |
| | ) | Hon. Timothy A. Barnes |
| Plaintiff, | ) | |
| v. | ) | Adv. Proc. No. |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Andrew J. Maxwell ("Plaintiff" or "Trustee"), as Chapter 7 trustee for the

estate of Horizon Group Management, LLC (the "Debtor" or "Horizon Management"),

by and through his attorneys, BAUCH & MICHAELS, LLC, for his claims for relief

against the United States of America (the "Defendant"):

### I.      NATURE OF ACTION

1.      Daniel Michael ("Daniel") acquired, owned and managed a sizable

portfolio of residential apartment buildings (the "Properties") through an enterprise

of family trusts and affiliated management and ownership entities, of which the

Debtor was an integral part, commonly known as the "Horizon Realty Group"

(hereafter described as the "Horizon Group Enterprise"). The Debtor was the

exclusive managing agent for the Horizon Group Enterprise's business and

properties. The Debtor was intended to, and did in fact, function as a mere alter ego

and instrumentality of Daniel and the Horizon Group Enterprise. Daniel was the

Debtor's Manager. The Debtor employed Daniel's son, Jeffrey Michael ("Jeffrey"), as its chief operating officer ("COO") and General Counsel.

2.      Since most of the Properties were located in the municipality of Chicago, Illinois, the ownership and management of the properties were subject to the Chicago Residential Landlord Tenant Ordinance ("RLTO"). During 2007-2009, the Horizon Group Enterprise committed multiple violations of the RLTO, which its own attorneys estimated as subjecting it to a liability of approximately $1.8 million. In June of 2009, a former tenant filed a "Class Action" against the Debtor relating to the RLTO violations. Daniel and Jeffrey believed that the Horizon Group Enterprise faced substantial liability in the Class Action. Rather than compromising the claims, as repeatedly recommended by its attorneys, the Horizon Group Enterprise pursued a "scorched earth" defense. Shortly after the filing of the Class Action, Daniel and Jeffrey commenced actions intended to prejudice the Debtor's creditors, including, but not limited to, attempting to limit the Debtor's recourse against other members of the Horizon Group Enterprise. After the Class Action court made a summary determination of liability against the Horizon Group Enterprise in July of 2011, Jeffrey aggressively sought the advice of numerous attorneys regarding a scheme to delay, hinder and defraud the Debtor's creditors by, *inter alia*, ultimately transferring over $2.5 million in assets to or for the benefit of insiders and filing a strategic bad faith Chapter 11 bankruptcy case. In particular, the Debtor transferred in excess of $50,000 directly to the Defendant to satisfy personal tax obligations of Daniel and Martha Michael, Daniel's wife or Jeffrey.

3.      After suffering additional adverse rulings in the Class Action, including the certification of a class, the Horizon Group Enterprise entered into the hereafter described Settlement Agreement relating to the Class Action. In the Settlement Agreement, the Horizon Group Enterprise made representations regarding its financial ability to perform and agreed to post a letter of credit as security for such performance. In order to cause the Class Action creditors to forbear from demanding the posting of the letter of credit required under the Settlement Agreement, the Horizon Group Enterprise procured from its bank a fraudulent written representation of the Debtor's financial ability to perform under the Settlement Agreement.

4.      After Class Counsel filed fee applications, the Horizon Group Enterprise proceeded in seeking approval of the Settlement Agreement, while at the same time arranging to further strip the Debtor of its assets and render it "judgment proof." After the Class Action court awarded substantial attorneys' fees, Daniel and Jeffrey caused the Debtor to file a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in a scheme to limit the liability of the Horizon Group Enterprise by selling the Debtor's assets and assigning its management agreements to an entity controlled by Jeffrey. This scheme failed. Thereafter, this Court converted the Chapter 11 case to Chapter 7, and the Trustee was appointed. The Trustee pursued an investigation of the Debtor's affairs, which (although hindered by Daniel and Jeffrey's failure to cooperate) disclosed the factual basis for the claims asserted in

this and related actions against the Horizon Group Enterprise and various initial transferees of the Debtor's assets.

5.      In addition to the relief sought in a related adversary proceeding against the Horizon Group Enterprise, the Trustee is also seeking to recover multiple fraudulent transfers to the Defendant and other third party initial transferees. All of the transfers and distributions were made with the actual intent to delay, hinder and defraud creditors and were constructively fraudulent.

## II.    JURISDICTION

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334, because the proceeding arises under, arises in or is related to a case under the Bankruptcy Code. This is an action pursuant to 11 U.S.C. §§ 544, 548, 549 and 550, applicable non-bankruptcy law, including the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq.* and Fed. R. Bankr. P. 7001(1), (7), and (9) to recover property or money.

7.      This is a statutory core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (H) and (O) with respect to Counts I and II.

8.       To the extent that the bankruptcy court may not constitutionally or statutorily enter a final judgment on any counts of the complaint, the Trustee consents to the bankruptcy court's entry of final judgment on all counts. To the extent that the Defendant does not consent to the entry of final judgment on all or some counts of the complaint, the Trustee consents to the bankruptcy court entering proposed findings of fact and conclusions of law for transmittal to the United States

District Court for the Northern District of Illinois, Eastern Division, on any counts upon which it is determined that the bankruptcy court may not enter final judgment.

9.     Venue is proper in this district pursuant to 28 U.S.C. § 1409.

### III.   PARTIES AND SIGNIFICANT PERSONS

10.     The Trustee is the duly appointed and acting trustee in this case under Chapter 7 of the United States Bankruptcy Code.

11.     The Debtor is an Illinois limited liability company that was engaged in the residential real property management business as "sole and exclusive manager" for the hereinafter defined "Horizon Group Companies" and last maintained an office at 1946 West Lawrence Avenue, Chicago, Illinois.

12.     The Defendant is the United States of America, which acts on behalf of the Internal Revenue Service ("IRS").

13.     Daniel is an individual and citizen of the state of Florida. Daniel is the sole manager of the Debtor and a person in control of the Debtor and the Horizon Group Enterprise.

14.     Daniel is the trustee of the Daniel Michael Living Trust u/t/a/d March 4, 1998, an *inter vivos* Illinois trust (the "Daniel Trust"). The Daniel Trust is both the general and limited member of the Debtor. Notwithstanding the foregoing, Daniel holds himself out as the "owner" and "equity security holder" of the Debtor.

15.     Martha Michael ("Martha") is an individual and a citizen of the state of Florida. Martha is Daniel's wife.

16.     Jeffrey is an individual and a citizen of the state of Illinois. Jeffrey is the son of Daniel and Martha. Jeffrey was licensed as an attorney in Illinois and has a

background in accounting and finance. He was employed as an associate attorney at several Chicago-based law firms, where he concentrated in corporate and real estate transactional law. As of May 2001, the Debtor employed Jeffrey as its COO and General Counsel. Jeffrey was admitted to the Illinois bar on November 6, 1997. On January 11, 2013, the Illinois Supreme Court determined that Jeffrey was unauthorized to practice law in Illinois, and he was stricken from the Master Roll of Attorneys because he failed to comply with mandatory continuing legal education requirements. On February 28, 2013, Jeffrey elected, pursuant to Illinois Supreme Court Rule 756(a)(5), voluntary inactive status with the Illinois Attorney Registration and Disciplinary Commission ("ARDC"). Subsequent to January 11, 2013, Jeffrey continued to act as general counsel of the Debtor before and during these bankruptcy proceedings and was employed by the Debtor to provide legal services, notwithstanding his lack of authority to practice law in Illinois. Until the date of his Rule 2004 examination, Daniel did not know that Jeffrey was not authorized to practice law in Illinois after January 11, 2013.

17.    Horizon Group I, LLC is an Illinois limited liability company organized on or about November 26, 1997, that holds legal title to certain residential real property commonly known as 1938-50 West Lawrence, Chicago, Illinois.

18.    Horizon Group II, LLC is an Illinois limited liability company organized on or about March 26, 1998, that holds legal title to certain residential real property commonly known as 901 West Argyle, Chicago, Illinois.

19.     Horizon Group III, LLC is an Illinois limited liability company organized on or about March 26, 1998, that holds legal title to certain residential real property commonly known as 1901-09 West Wilson, Chicago, Illinois.

20.     Horizon Group IV, LLC is an Illinois limited liability company organized on or about March 26, 1998, that holds legal title to certain residential real property commonly known as 722-726 West Barry, Chicago, Illinois.

21.     Horizon Group V, LLC (formerly known as Lawrence Maplewood, LLC), Illinois Secretary of State file no. 03457532, is an Illinois limited liability company organized on or about March 8, 2011, that may hold legal title to certain residential real property commonly known as 4759 North Maplewood, Chicago, Illinois. Horizon Group V, LLC is the successor to "Horizon Group V, LLC f/k/a Daniel Michael V, LLC," Illinois Secretary of State file no. 00179302, an Illinois limited liability company organized on March 26 1998, which was involuntarily dissolved by the Illinois Secretary of State on September 10, 2010.

22.     Horizon Group VI, LLC is an Illinois limited liability company organized on or about March 26, 1998, that holds legal title to certain residential real property commonly known as 5650 North Sheridan, Chicago, Illinois.

23.     Horizon Group VII, LLC is an Illinois limited liability company organized on or about December 29, 1999, that holds legal title to certain residential real property commonly known as 910-18 West Dakin, Chicago, Illinois.

24.    Horizon Group VIII, LLC is an Illinois limited liability company organized on or about November 9, 2000, that holds legal title to certain residential real property commonly known as 100 Fellows Court, Elmhurst, Illinois.

25.    Horizon Group IX, LLC is an Illinois limited liability company organized on or about August 29, 2001, that holds legal title to certain residential real property commonly known as 525 West Oakdale, Chicago, Illinois.

26.    Horizon Group X, LLC, f/k/a Horizon Development, LLC, is an Illinois limited liability company organized on or about March 8, 2000, that holds legal title to certain residential real property commonly known as 4242 North Sheridan, Chicago, Illinois.

27.    Horizon Group XI, LLC is an Illinois limited liability company organized on or about December 12, 2003, that holds legal title to certain residential real property commonly known as 5017 North Wolcott, Chicago, Illinois.

28.    Horizon Group XV, LLC is an Illinois limited liability company organized on or about December 17, 2003, that holds legal title to certain residential real property commonly known as 1828-38 West Lawrence, Chicago, Illinois.

29.    Horizon Group XVI, LLC is an Illinois limited liability company organized on or about December 17, 2003, that holds legal title to certain residential real property commonly known as 1956-60 West Lawrence, Chicago, Illinois.

30.    Horizon Group XVII, LLC is an Illinois limited liability company organized on or about October 7, 2004, that holds legal title to certain residential real property commonly known as 6401 North Sheridan, Chicago, Illinois.

31.     Horizon Group XVIII, LLC is an Illinois limited liability company organized on or about March 2, 2005, that holds legal title to certain residential real property commonly known as 6040 North Sheridan, Chicago, Illinois.

32.     Horizon Group XIX, LLC is an Illinois limited liability company organized on or about March 9, 2006, that holds legal title to certain residential real property commonly known as 6725 North Sheridan, Chicago, Illinois.

33.     Horizon Group XX, LLC is an Illinois limited liability company organized on or about December 8, 2006, that holds legal title to certain residential real property commonly known as 4600 North Clarendon, Chicago, Illinois and 822 West Wilson, Chicago, Illinois.

34.     Horizon Group XXI, LLC is an Illinois limited liability company organized on or about June 26, 2009, that holds legal title to certain residential real property commonly known as 4601-13 North Sheridan, Chicago, Illinois.

35.     Horizon Group XXII, LLC is an Illinois limited liability company organized on or about May 3, 2011, that holds legal title to certain residential real property commonly known as 5050 North Sheridan, Chicago, Illinois.

36.     Horizon Group XXIII, LLC is an Illinois limited liability company organized on or about July 9, 2012, that holds legal title to certain residential real property commonly known as 1605-31 Chicago Avenue, Evanston, Illinois.

37.     Horizon Group XXIV, LLC is an Illinois limited liability company organized on or about November 22, 2013, that holds legal title to certain residential real property commonly known as 6119 North Kenmore, Chicago, Illinois.

38.    The entities described in paragraphs 17 through 37 are hereinafter collectively referred to as the "Horizon Group Companies," and the residential real property they own are collectively referred to as the "Properties."

39.    Horizon Group Realty Holdings, LLC is an Illinois limited liability company organized on June 5, 2009 ("Holdings"). Daniel organized Holdings as part of an "estate plan" restructuring of the ownership of the Horizon Group Companies. Daniel is the sole manager of Holdings. On or about June 5, 2009, Daniel as manager on behalf of Holdings and the original members of Holdings, the Daniel Trust (24.13%); Martha Michael ("Martha"), not individually, but solely as trustee of the Martha Michael Living Trust dated March 4, 1998 ("Martha Trust") (23.07%); Daniel Michael, not individually but solely as trustee of David S. Michael Irrevocable Trust dated June 9, 2004 (16.60%); Jeffrey E. Michael, not individually but solely as trustee of the Jeffrey E. Michael Revocable Trust dated July 4, 2002 (16.60%); Daniel Michael, not individually, but solely as trustee of the Tracy H. Michael Irrevocable Trust dated June 9, 2004 (16.60%); David S. Michael, individually (1%); Jeffrey E. Michael, individually (1%); and Tracey H. Wolfe, individually (1%) executed an operating agreement for Holdings. On or about February 15, 2010, Daniel, as manager of Holdings, executed an "Issuance of New Units in Horizon Realty Group Holdings, LLC and First Amendment to Horizon Realty Group Holdings, LLC Operating Agreement," pursuant to which the membership interests of Holdings were reallocated as follows: Daniel Michael & Martha Michael Irrevocable Trust dated December 1, 2009 (24.67%); Daniel S. Michael Irrevocable Trust dated June 9, 2004

(23.68%); Tracy H. Michael Irrevocable Trust dated June 9, 2004 (23.68%); Jeffrey E. Michael Revocable Trust dated July 4, 2002 (23.68%); David S. Michael (1.43%); Tracy H. Michael (1.43%); and Jeffrey E. Michael (1.43%). All of the members of Holding are Daniel and Martha's trusts; Daniel and Martha's children; or Daniel and Martha's children's trusts. At or shortly after its organization, Holdings replaced Daniel as the manager of the then existing Horizon Group Companies and became the initial manager of all of the Horizon Group Companies that were organized after Holdings' organization. At or shortly after its organization, Daniel transferred his membership interests in all of the then existing Horizon Group Companies to Holdings, and Holdings became the initial member of all of the Horizon Group Companies that were organized after Holdings' organization.

40.    The Debtor, the Horizon Group Companies, and Holdings held themselves out to the public and did business under the assumed or fictitious names "Horizon Realty Group," "Horizon Group" and "Horizon."

41.    The Debtor, Holdings, the Horizon Group Companies, Daniel, the Daniel Trust, and Jeffrey are hereinafter collectively referred to as the "Horizon Group Enterprise."

## IV.    HISTORICAL BACKGROUND

42.    Daniel is an entrepreneur and real estate investor who began acquiring residential apartment buildings primarily in the municipality of Chicago, Illinois beginning in or about 1984. Daniel originally managed and held title to the apartment buildings individually or through land trusts. In 1987, Daniel started a "management arm" for his residential apartment building business. Prior to the organization of the

Debtor and the Horizon Group Companies, Daniel did business individually under the fictitious names "Horizon Group" and "Horizon Realty" and filed actions relating to his residential real property business in the Circuit Court of Cook County under both his name and Horizon Realty.

43.    Between 1997 and 2014, Daniel organized a separate limited liability company to be the fee owner of each of the Properties. Daniel transferred title of each of his individually owned Properties to a newly organized limited liability company and organized a new limited liability company to hold title to newly acquired Properties. Over the course of three decades, the Horizon Group Enterprise acquired over 25 apartment buildings. In 2000, Daniel organized the Debtor to serve as the managing agent for the Horizon Group Companies and the Properties. The Debtor, the Horizon Group Companies and Holdings operated as an integrated real estate management and ownership enterprise that acquired, developed, managed and operated residential apartment buildings in Chicago and its suburbs under the Debtor's assumed name "Horizon Realty Group."

A.    THE ORGANIZATION, OPERATING AGREEMENT, MANAGER, MEMBERS AND COO/GENERAL COUNSEL OF THE DEBTOR.

44.    On November 9, 2000, Daniel organized the Debtor by filing the articles of organization with the Illinois Secretary of State. Thereafter, Daniel caused the Debtor to act as the exclusive agent and property manager for the Horizon Group Companies and the Properties from its inception in 2000 until the closing of the sale of its assets and the cessation of its operations on April 30, 2015.

45.     The Debtor adopted, pursuant to Section 1-20 of the Illinois Limited Liability Company Act, the assumed names of "Horizon Realty Group" and the "Merion." The Debtor, the Horizon Group Companies, and Holdings all operated under the assumed name "Horizon Realty Group." The Debtor and Horizon Group XXIII, LLC also operated under the assumed name the "Merion."

46.     On January 13, 2001, Daniel, as Manager of the Debtor, and Daniel as trustee of the Daniel Trust, as "General Member" of the Debtor, executed an "Operating Agreement" for Debtor. The Debtor's Operating Agreement provides for two classes of membership: a general member and a limited member. On January 13, 2001, Daniel as trustee of the Daniel Trust, executed an "Acknowledgement and Consent" "to participating in and becoming a Limited Member of the Debtor" as defined in the Operating Agreement.

47.     At all times relevant to this action, Daniel was the sole manager and was otherwise in control of Debtor. At all times relevant to this action, the Daniel Trust owned all of the membership interests of the Debtor.

48.     Section 9.02 of the Operating Agreement requires the "General Member" to make additional capital contributions to the Debtor "as shall be determined by a Majority Interest from time to time to be reasonably necessary to meet the expenses and obligations of the [Debtor]." Section 1.01(v) of the Operating Agreement defines the "Majority Interest" as "one or more General Member Interests which in the aggregate exceed 50% of all Percentage Interests attributed to the General Members." The Debtor has one General Member: namely, the Daniel Trust.

13

49.    Section 10.05 of the Operating Agreement, *inter alia,* prohibits distributions while or which would render the Debtor insolvent.

50.    Beginning in May 2001, pursuant to Daniel's appointment and with Daniel's full authority and consent as Manager, the Debtor employed Jeffrey as its Chief Operating Officer and General Counsel. In this capacity, Jeffrey was responsible for and supervised day-to-day activities of the Debtor's agents, attorneys and employees relating to the operation of the Debtor's business and the Properties, including legal compliance and litigation. Since January 2013, the Debtor paid Jeffrey an annual salary of at least $600,000.00 for his services as COO and General Counsel.

## B.    THE MANAGEMENT AGREEMENTS, OPERATING ACCOUNTS, AND FINANCIAL REPORTING.

51.    The Debtor owned no real property and had no business other than providing financial and property management services to the Horizon Group Enterprise. At all times relevant to this action, the Debtor's assets were two motor vehicles, computer hardware and software, internet domain names, office equipment and furniture, the hereafter described Management Agreements, the assumed names "Horizon Realty Group" and "The Merion," and cash it held pending disbursement for payroll, office and overhead expenses, and direct or indirect distributions to Daniel. The Debtor has represented to this Court that the fair value of all of its assets has never been more than $75,000. The Debtor itself had no profit motive for its business, conducted no business for its own account, and solely conducted the business of the

Horizon Group Enterprise. Daniel and Jeffrey intended that the Debtor would have "no real assets" and would be "judgment proof."

52.      The Debtor functioned as a mere instrumentality for the Horizon Group Enterprise. The Debtor was the employer and paymaster for all employees of the Horizon Group Enterprise, including executive, accounting, maintenance, and onsite property management employees. The Debtor also leased office space from one of the Horizon Group Companies and paid the expenses of the central office that served as the principal place of business and record office of the Debtor, Holdings, the Horizon Group Companies, and the Horizon Group Enterprise. Conversely, the Horizon Group Companies and Holdings had no employees, and all actions taken in connection with the operation of their businesses were performed by the Debtor's employees.

53.      On January 1, 2004, the Debtor and certain of the Horizon Group Companies entered into the first of a series of written management agreements. On January 1, 2008, the Debtor and the then existing Horizon Group Companies, as "Owner," entered into an *Amended & Restated Management Agreement*. On July 1, 2009, the Debtor and all of the then existing Horizon Group Companies executed the *First Amendment to the Amended & Restated Management Agreement*, which added additional "Owner" entities as parties.

54.      The *Amended and Restated Management Agreement* and the *First and Second Amendments* thereto were executed by Daniel as manager of the Debtor on behalf of the Debtor and Daniel as manager on behalf of each of the then existing Horizon Group Companies.

55.    Pursuant to the *Amended & Restated Management Agreement*, the Horizon Group Companies, *inter alia*, appointed the Debtor as "sole and exclusive manager of Owner to manage the [Properties]," agreed to pay all reasonable expenses in connection with the Debtor's management services as approved by Owner, defined the relationship as that of "principal and agent," acknowledged that the Debtor was not required to "bear any portion of losses arising out of or connected with Owner or the operation of the [Properties]," and agreed to pay the Debtor as compensation an amount equal to "any and all costs, expenses and fees incurred by [the Debtor] in connection with and allocable to the operation and management of the [Properties], including, without limitation, all labor, administrative and overhead costs and expenses incurred by [the Debtor]." Section 1.1, Article XII, and Article XIII.

56.    Pursuant to the terms of the *Amended & Restated Management Agreement*, on or about August 20, 2008, the Debtor established under its federal employer identification number a business checking account number XXX2969 (the "2969 Operating Account") at the Northern Trust Bank ("Northern Trust") as the primary operating account for the Horizon Group Enterprise. The Debtor deposited all rental income received from the Properties into the 2969 Operating Account and made disbursements to pay debt service, real estate taxes and the operating expenses of the Properties; the operating expenses of the Debtor's management operation; and the personal expenses of Daniel and other Michael family members from the 2969 Operating Account. In the event of any deficiency, the Horizon Group Companies

were obligated to advance a contingency reserve to the 2969 Operating Account in an amount sufficient to pay disbursements due and payable.

57.     On December 1, 2009, the Debtor and all of the then existing Horizon Group Companies executed the *Second Amendment to the Amended & Restated Management Agreement*, which amended Article XIII, "Compensation and Expenses," and Article XVI, "Termination," of the *Amended & Restated Management Agreement*.

58.     On February 4, 2010, Holdings established a business checking account number XXXXXX4717 at the Northern Trust Bank (the "4717 Operating Account"). After an initial deposit and withdrawal of approximately $2.7 million, the 4717 Operating Account remained dormant with a nominal balance of less than $5,000 until November 2011.

59.     The Debtor owned, operated, and managed the Horizon Group Enterprise's information technology systems, including the internet domain name www.horizonrealtygroup.com and accounting software programs. In 2010, Jeffrey was generally dissatisfied with the accounting system and financial reporting. On August 27, 2010, the Debtor executed an Application Hosting and Software License Agreement with Yardi Systems, Inc. ("Yardi"). On or about October 1, 2010, the Debtor implemented Yardi's proprietary "real property and asset management software," which offers particular modules for residential real property management and ownership enterprises (the "Yardi System"). The Yardi System records all transactions of the Horizon Group Enterprise in a single consolidated general ledger.

60.    In September of 2011, as described in more detail hereafter, Jeffrey determined that the Debtor and the Horizon Group Companies had substantial liability in the hereinafter described "Class Action." Jeffrey was considering bankruptcy for the Debtor and seeking legal opinions as to whether the Debtor's corporate veil could be pierced to hold Daniel liable for the claims asserted in the Class Action. In furtherance of a scheme to defraud creditors and to insulate the Horizon Group Enterprise from liability in the Class Action, Jeffrey caused the Debtor and the Horizon Group Companies to enter into a *Second Amended & Restated Management Agreement* and adopted new accounting and cash management procedures in an attempt to insulate the Horizon Group Enterprise from liability in the Class Action.

61.    On or about October 25, 2011, shortly before the effective date of the *Second Amended & Restated Management Agreement*, Daniel and Jeffrey caused the 2969 Operating Account to be retitled in the name of Holdings and the 4717 Operating Account to be retitled in the name of the Debtor. Thereafter, the Debtor began using the 4717 Operating Account as its primary operating account for disbursements of Horizon Group Enterprise payroll, "management company" office expenses, and distributions to Daniel and Martha and the 2969 Operating Account as the Horizon Group Companies primary operating account for deposits of rental income from the Properties and direct Properties related disbursements such as mortgage and real estate tax payments. Notwithstanding the establishment of the two separate accounts, the Horizon Group Enterprise continued to use the 2969

18

Operating Account to pay certain of the Debtor's expenses and personal expenses of Daniel and his family members and the 4717 Operating Account to pay certain of the Horizon Group Companies expenses and personal expenses of Daniel and his family members.

62.    As of December 1, 2011, the Debtor and the Horizon Group Companies entered into a *Second Amended & Restated Management Agreement*. The *Second Amended & Restated Management Agreement* was executed by Daniel as manager of the Debtor and Holdings as manager of each of the then existing Horizon Group Companies, by Daniel as manager of Holdings. In fact, Jeffrey was still consulting with a bankruptcy and creditors' rights attorney regarding and reviewing drafts of the *Second Amended and Restated Management Agreement* as late as December 13, 2011, with the intent of limiting the Debtor's recourse against the Horizon Group Companies with respect to the Class Action.

63.    Pursuant to the *Second Amended & Restated Management Agreement*, *inter alia*, each of the Horizon Group Companies, as "Owner," appointed the Debtor as their "sole and exclusive *operational* manager of the [Properties];" agreed to pay all reasonable expenses in connection with the Debtor's management services; defined the relationship as that of "principal and agent;" acknowledged that the Debtor was not required to "bear any portion of losses arising out of or connected with Owner or the operation of the Properties;" and agreed to pay the Debtor as compensation for services provided "a fee in an amount equal to Owner's share of any and all costs, expenses (direct or indirect) and fees incurred by [the Debtor] on behalf

of an Owner in connection with and allocable to the operation and management of the Properties owned by Owner and the operation of [the Debtor] that is not otherwise reimbursed to [the Debtor] as provided in this Agreement (the 'Component A Fee'). The Component A Fee shall include without limitation, (i) all cost, expenses, and fees, for material, labor and services rendered, (ii) administrative expense, labor and overhead costs incurred by [the Debtor] on behalf of an Owner, and (iii) those expenses incurred by [the Debtor] in relation to its own operation and the operation of each of the Properties owned by the Owners. . . ." Section 1.1, Article II and Article XI.

64.     Pursuant to Section 3.1 of the *Second Amended & Restated Management Agreement*, the Debtor and the Horizon Group Companies agreed that the Horizon Group Companies shall establish a bank account for their own benefit in the name of Holdings under Holdings' federal tax identification number, which was described as the "Owner Account." The Debtor was authorized to act as agent with respect to "collecting gross rental receipts and other monies that shall be deposited into the Owner Account."

65.     Pursuant to Section 3.1 of the *Second Amended & Restated Management Agreement*, the Debtor was authorized to establish bank accounts for its own benefit, provided that the Owner Account was to remain separate and distinct.

66.     Pursuant to the *Second Amended & Restated Management Agreement*, the Horizon Group Companies were obligated to carry such insurance, including comprehensive general liability insurance, as the Debtor determined was necessary

20

to protect the Horizon Group Companies interest in the Properties. Jeffrey was the individual employed by the Debtor who was responsible for determining the appropriate coverages and purchasing insurance on behalf of the Debtor and the Horizon Group Companies.

67.     The Debtor's primary change in operating procedures under the *Second Amended & Restated Management Agreement* was the use of two operating accounts. The 2696 Operating Account and the 4717 Operating Account for the Horizon Group Enterprise. On or about November 15, 2011, the Debtor and the Horizon Group Companies began operating under the *Second Amended & Restated Management Agreement*. Pursuant to the new operating procedures, the Debtor deposited rents and disbursed debt service and direct property operating expenses for the Properties through the 2969 Operating Account. Pursuant to the new operating procedures, the Debtor paid payroll, management company overhead expenses, and the personal expenses of Daniel, Martha, and other family members through the 4717 Operating Account. The Debtor periodically transferred funds from the 2969 Operating Account to the 4717 Operating Account in amounts roughly equal to the disbursements from the 4717 Operating Account.

68.     Notwithstanding the foregoing, the Debtor also directly paid what Jeffrey has characterized as "management company" expenses from the 2969 Operating Account, including in particular the attorneys' fees and defense costs of the hereinafter described "Class Action." In regard to the Class Action defense attorneys' fees and costs, Jeffrey reviewed and approved payment of each of the law

21

firm invoices from the 2969 Operating Account as an "Owner" expense. Jeffrey also approved the Debtor's payment of the $5,000 Bonnen incentive award and $40,000 of the Class Action settlement from the 2969 Operating Account. With respect to the attorneys' fees and the Bonnen incentive award, the Debtor did not contemporaneously record any expenses in its ledgers or journals. With respect to the Class Action class settlement payment, the Debtor recorded the payment as a loan from owner to the Debtor and a litigation expense, the day after Daniel and Jeffrey first met with the Debtor's bankruptcy attorneys in September of 2014. The Debtor also made direct disbursements from the 2969 Operating Account to third parties for personal expenses of Daniel and his family members, including but not limited to his grandchildren's summer camp expenses and the purchase of a new Lexus automobile for Martha.

69.     The 4717 Operating Account was funded with transfers from the 2969 Operating Account on an as-needed basis. After November 2011, the Debtor was overdrawn periodically in its 4717 Operating Account and typically held cash only in amounts sufficient to satisfy outstanding payroll and payroll related obligations, such as health insurance and payroll taxes, and "distributions" to pay personal expenses of Daniel and his family members. Daniel intended that the Debtor's revenue and expenses would be roughly equal to each other.

70.     Daniel did not receive compensation from the Debtor but "basically, took whatever it is I needed to at the time. I didn't have a set salary." Daniel used the Debtor's assets to pay "day-to-day living expenses. My automobiles, my credit card

payments." All of which were "personal expenses." Daniel did not review the Debtor's financial statements or make any other determination regarding whether it was appropriate to have the Debtor make distributions to him in the form of paying his personal expenses at the time of any such distributions.

71.     Sometime in 2011, the Horizon Group Enterprise retained the accounting firm of Kutchins Robbins & Diamond, Ltd ("KRD"), and in particular its partner Mitchell Knopoff and associate Katie Demert, to act as tax return preparers for the Debtor, the Horizon Group Companies, Holdings, Daniel, Martha, and certain other members of the Michael family. Knopoff had a prior relationship with the Horizon Group Enterprise at a predecessor accounting firm. KRD's engagement with the Horizon Group Enterprise was limited to reviewing trial balances, making certain tax-based adjustments and preparing tax returns and schedules for Daniel, Martha, the Debtor, Holdings, and certain Michael family trusts.

72.     KRD consolidated the Horizon Group Companies' income and expenses on Holdings' Form 1065, because after the 2009 restructuring of the Horizon Group Enterprise, Holdings was the sole common owner of the Horizon Group Companies.

73.     For the tax year 2010, the Debtor's income and expenses were "erroneously" consolidated with those of the Horizon Group Companies and reported on Holdings' Form 1065. This error occurred because KRD assumed that the Debtor and the Horizon Group Companies were under the common ownership of Holdings and that the Debtor's income and expenses could be consolidated with the income and expenses of the Horizon Group Companies on Holdings' Form 1065. As reported to

KRD, the Debtor's trial balance for 2010 reflected revenue of $3,071,383 and expenses of $3,071,383, or a net profit of zero.

74.     In connection with the preparation of tax returns for the Horizon Group Enterprise, and in particular the Debtor and Daniel and Martha, KRD would remotely access the Yardi System and create trial balance reports of income and expenses. KRD reviewed the trial balances, made adjustments, which, *inter alia*, substantively treated nondeductible expenditures as distributions to Daniel and income to the Debtor. KRD allocated certain of the Debtor's "expenses" between "Schedule C," the Debtor's business income and expenses, and "Schedule A," the Debtor's payments of the real estate taxes on Daniel and Martha's personal residence, and their personal charitable contributions. KRD would then report the real estate taxes and charitable contributions on Daniel and Martha's individual Form 1040, Schedule A and the income or loss from the Debtor's operations on Daniel and Martha's Form 1040, Schedule C. KRD also reviewed Daniel's draw account to determine whether any of the expenses were deductible, or whether they were required to be included as income or nondeductible expenses on Daniel and Martha's individual returns.

75.     In reviewing the 2011 year-end financial statements (a year when the Horizon Group Enterprise primarily operated through the 2969 Operating Account while it was still in the name of the Debtor), Knopoff determined that distributions from the Horizon Group Enterprise to Daniel should be recorded as distributions from the Debtor, because of Daniel's sole ownership of the Debtor. In connection with the

reconciliation of the Debtor's financial statements and the preparation of the Horizon Group Enterprises' tax returns for 2011, KRD reclassified expenditures for non–deductible personal expenses that were paid by the Debtor through the 2969 Operating Account, to Daniel's draw account with the Debtor:

- 11/22/2011: $379,598.67 Daniel loan owed to the Debtor reclassified as a distribution;

- 12/31/2011: $27,997.01 reclassify Daniel draws to the Debtor;

- 12/31/2011: $292,240.54 reclassify Daniel draws to the Debtor;

- 12/31/2011: $3,729.46 transfer Clark County taxes to Daniel's Debtor draw account;

- 12/31/2011: $2,979.63 transfer non-deductible expenses to Daniel's Debtor draw account;

- 12/31/2011: $9,364.25 transfer Palm Beach taxes to Daniel's Debtor draw account.

76.     For the tax years 2011 through 2014, the Debtor reported its income and expenses for federal income tax reporting purposes on Schedule C to Daniel and Martha's individual federal income tax return. The Debtor's gross income and net profit reported on the Schedule C for the tax years 2011 through 2014 was as follows:

| Tax Year | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|
| Gross Income | 3,169,888 | 3,757,275 | 2,366,549 | 1,828,483 |
| Net Profit | 370,298 | 481,560 | 836,862 | (24,489) |

77.     With respect to the 2013 tax year, pursuant to Jeffrey's instructions, Knopoff added an additional $220,000 in management fees to the gross income of the

Debtor that was not recorded in the Yardi system. Jeffrey provided Knopoff with no explanation for this increase in gross income. The Debtor's year-end 2013 and opening 2014 balance sheet reflected a "due from" asset in the amount of $220,000 that "disappeared" from the 2014 year-end balance sheet.

78.    All of the net "profits" of the Debtor prior to the bankruptcy were paid out to or for the benefit of Daniel and Martha and treated as distributions to Daniel.

79.    During the years 2012-2014, the 3717 Operating Account reflected the following deposits and withdrawals:

| Year | 2012 | 2013 | 2014 |
|------|------|------|------|
| Deposits | 3,687,938 | 4,703,335 | 5,216,897 |
| Withdrawals | 3,693,715 | 4,696,609 | 5,223,109 |

80.    A comparison of reported Schedule C Income and Expenses to actual deposits and withdrawals reflects material discrepancies:

| Tax Year | 2012 | 2013 | 2014 |
|----------|------|------|------|
| Deposits per Bank Stmts | 3,687,938.10 | 4,703,335.05 | 5,216,896.73 |
| Schedule C Income | 3,757,275.00 | 2,336,549.00 | 1,828,483.00 |
| Difference | (69,336.90) | 2,336,786.05 | 3,388,413.73 |

| Tax Year | 2012 | 2013 | 2014 |
|----------|------|------|------|
| Withdrawals per Bank Stmts | 3,693,841.08 | 4,696,609.12 | 5,223,109.59 |
| Schedule C Expenses | 3,275,715.00 | 1,529,687.00 | 1,852,972.00 |
| Difference | 418,126.08 | 3,166,922.12 | 3,370,137.59 |

81.    The discrepancies in reported taxable income and expenses to actual deposits and withdrawals relate to the Debtor and the Horizon Group Enterprise's continuing commingling of funds by the Horizon Group Enterprise's use of the 4717

Operating Account to accept deposits of income and make disbursements for expenses that were reported on the books and records of other members of the Horizon Group Enterprise.

82.     During the four years preceding the filing of the Debtor's bankruptcy petition, while the Class Action was pending, and while Jeffrey was actively seeking to insulate the Horizon Group Enterprise from the Class Action liability, Daniel used the Debtor, the 2969 Operating Account, and 4717 Operating Account as mere instrumentalities for the payment of his personal expenses in support of a lavish lifestyle, including, but not limited to, a monthly cash "allowance" for Martha; country club dues and expenses of himself and Martha; real estate taxes on his and Martha's Florida personal residences; summer camp fees for his grandchildren; legal fees for personal estate planning services; personal expenses charged on Martha's credit cards, including jewelry, clothing, expensive restaurants, leisure travel, and other luxury items; insurance on his personal residences and personal assets; personal charitable and political contributions; and personal federal income tax liabilities to the IRS. Daniel also caused the Debtor to pay Jeffrey a salary, benefits and expense reimbursements far in excess of the fair market value of his services. Finally, Daniel caused the Debtor to pay the health insurance of Tracy Michael Wolfe (a/k/a Tracy H. Wolfe) ("Tracy"), Daniel's daughter, even though she had no relationship with the Debtor. A summary of the distributions and transfers to or for the benefit of Daniel, Martha, Jeffrey and other insiders is set forth on the attached Exhibit A.

83.     Daniel caused the Debtor to make such distributions while the Debtor was insolvent, in violation of the Operating Agreement and the Illinois Limited Liability Company Act, with the actual intent to delay, hinder and defraud creditors of the Debtor, primarily Bonnen and Class Counsel, and in violation of his fiduciary duties to the Debtor.

## C.   THE CLASS ACTION.

84.     Because most of the Properties were located within the boundaries of the City of Chicago, an Illinois municipal corporation with "home rule" powers, the management and operation of the Properties was subject to the Chicago Residential Landlord and Tenant Ordinance ("RLTO"), Chicago Municipal Code, Title 5, chapter 12, *et seq.* ("RLTO"). The RLTO imposes certain obligations upon "managers" and "owners" of residential rental properties located in Chicago. The RLTO also provides penalties for violations of certain of its provisions, including the underpayment of interest on tenant security deposits and the failure to provide certain safety disclosures in connection with leases entered into between managers/owners and tenants. The RLTO also provides for awards of attorneys' fees to prevailing parties in cases involving violations of the RLTO. The owner, the Horizon Group Companies, and the managing agent, the Debtor, of the residential property are jointly and severally liable for violations of the RLTO without regard to fault.

85.     On February 8, 2001, the Illinois Supreme Court issued its opinion in *Lawrence v. Regent Realty Group*, 197 Ill. 2d 1, 754 N.E.2d 334, 257 Ill. Dec. 676 (Ill. 2001) upholding the RLTO and in particular its strict liability, statutory damages and attorneys' fee provisions.

86.     Because of the potential liability on RLTO claims, prudent residential property owners and managers purchased professional liability insurance to protect themselves from potential damage claims for RLTO violations. Although such insurance was available in the marketplace at a reasonable cost, Jeffrey did not purchase such insurance for the Debtor and the Horizon Group Companies.

87.     By the year 2007, the RLTO had survived constitutional challenges and a common practice evolved among more sophisticated Chicago residential rental property managers and owners to cease the practice of accepting security deposits on residential leases. Notwithstanding the foregoing, Daniel and Jeffrey continued to cause the Debtor and the Horizon Group Companies to require tenants to post security deposits in connection with residential leases.

88.     Jeffrey was the individual responsible for supervising employees and procedures of the Debtor and the Horizon Group Companies and in particular compliance with the RLTO security deposit and porch safety disclosure obligations.

89.     In 2007 through 2009, the RLTO required that interest be paid or credited on security deposits at a rate announced by the City Comptroller in the year in which a particular lease commenced or was renewed. During the years 2007 through 2009, the Debtor and the Horizon Group Companies had a practice of paying or crediting interest in the year that the interest was paid or credited based upon the rate in effect at the time of payment or credit—not the rate in effect at the time of the commencement or renewal of the lease. In the years 2007 through 2009, this practice resulted in the underpayment of interest on the security deposits for in excess of 1,000

tenants, subjecting the Debtor and the Horizon Group Companies to joint and several liabilities in excess of $1.1 million, plus attorneys' fees and costs.

90.    The RLTO also required that each tenant be provided with a written disclosure containing certain "porch safety" language specified in Section 5-12-170 of the RLTO. During the years 2007 through 2009, the Debtor and the Horizon Group Companies had a practice of using a master lease form that did not contain the required porch safety disclosure. This practice resulted in approximately 1,000 tenants not receiving the required disclosure, subjecting Horizon to a liability in excess of $60,000, plus attorneys' fees and costs.

91.    Jeffrey failed to exercise reasonable care in overseeing the Debtor and the Horizon Group Companies' compliance with the RLTO, resulting in the underpayment of interest on certain tenant security deposits and the failure to deliver a compliant porch safety disclosure notice, which subjected the Debtor and the Horizon Group Companies to the RLTO liabilities.

92.    On or about June 25, 2007, with an effective occupancy date of July 1, 2007, Amanda Bonnen ("Bonnen") entered into a residential lease agreement with the Debtor for apartment 608 in a residential building located at 4242 North Sheridan Road, Chicago, Illinois 60613. At the time of the execution of the lease, Bonnen paid the Debtor a security deposit of $250.00. At the time of the execution of the lease, the Debtor failed to provide Bonnen with the required written "porch safety" disclosure.

93.    The Debtor's lease form used in the Bonnen transaction contained a letter-head that stated "Horizon Realty Group" "Real Estate Management

Development." Bonnen's lease was executed by "Horizon Realty Group as managing agent for the legal owner. 7200."

94.    The Debtor failed to calculate and credit interest due on Bonnen's security deposit at the correct rate, resulting in an underpayment of interest upon the first anniversary of Bonnen's lease.

95.    On June 1, 2008, Bonnen renewed her lease for an additional year.

96.    The Debtor failed to calculate and credit interest due on Bonnen's security deposit at the correct rate resulting in an underpayment of interest upon the second anniversary termination of Bonnen's lease.

97.    On June 24, 2009, Bonnen filed a class action complaint to recover damages for the Debtor's violations of the RLTO against "Horizon Realty Group, LLC" in the Circuit Court of Cook County, Illinois, case number 2009 CH 20365. Bonnen alleged claims under the RLTO and sought statutory damages and attorneys' fees. The Law Offices of Jeffrey S. Sobek, P.C. and Edward T. Joyce & Associates, P.C. (collectively, "Class Counsel") represented Bonnen and appeared for her in the Class Action. Class Counsel had substantial experience and expertise in consumer and other class action litigation, including RLTO litigation.

98.    On June 24, 2009, Bonnen filed her motion for class certification in the Class Action.

99.    On or about June 26, 2009, an individual who identified himself as an officer of "Horizon," who upon information and belief was Jeffrey, telephoned Jeffrey Sobek ("Sobek"), one of Class Counsel, regarding the Complaint and after, *inter alia*,

discussing the substance of the complaint and proffering reasons why he believed Bonnen did not have a cause of action, stated that "if you do not dismiss the case, I will make sure that you lose your license to practice law." This was the first act in Daniel and Jeffrey's obsessive and unreasonable scorched earth defense of the Class Action and their calculated attempt to avoid the payment of claims arising in the Class Action.

100.   On July 23, 2009, the Debtor filed a complaint against Bonnen, contending that Bonnen defamed the Horizon Group Enterprise in social media when she "tweeted" about concerns resulting from water-infiltration that occurred in her apartment at one of the Properties. *Horizon Group Management, LLC v Bonnen*, 2009 L. 8675 (the "Twitter Lawsuit"). In its complaint, the Debtor admitted that it "conducts business under the name 'Horizon Realty Group,' 'Horizon Group' and 'Horizon' and is recognized as one of Chicago's premiere apartment leasing and management companies because it understands the importance of quality customer service and a well-maintained living environment." This Complaint attached a verification executed by "Jeff Michael" that states "Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that he is an authorized agent for *Horizon Realty Group, LLC*, the Plaintiff herein a limited liability company organized and doing business in the State of Illinois, that he had read the foregoing Verified Complaint and certifies that the statements set forth in this instrument are true and correct." (emphasis supplied).

101.    Subsequent to the filing of the Twitter Lawsuit, Jeffrey advised a Chicago Sun Times reporter seeking comment on the Twitter Lawsuit that: "We're a sue first, ask questions later kind of organization." On July 28, 2009, the Debtor issued a statement attributed to Jeffrey that apologized for the "tongue in cheek comments that were previously made regarding our approach to litigation."

102.    On or about August 14, 2009, the Debtor retained Sanford Kahn & Associates, Ltd. ("Sanford Kahn") as legal counsel to defend the Class Action. Richard Christoff ("Christoff"), a litigation partner with Sanford Kahn was the attorney with primary responsibility for the case. Jeffrey caused the Debtor to retain Sanford Kahn, because the firm was the Horizon Group Enterprise's counsel for eviction matters and because he believed it had expertise in landlord-tenant matters.

103.    On September 22, 2009, Joseph McGrath, Manager of The Greater New York Insurance Company, sent a letter to "Horizon Realty Group, LLC, Jeff Michael," relating to a claim submitted on behalf of named insured: "Horizon Development, LLC; Horizon Realty IX, LLC; Horizon Group III, LLC; Horizon Group IV, LLC." In this letter, McGrath confirmed a telephone conference with Jeffrey and advised that the insurer had opined that there was no coverage for the claims asserted in the Class Action under certain described policies. Jeffrey did not cause the Debtor to contest the denial of coverage.

104.    On October 13, 2009, Debtor filed a motion to dismiss the Class Action because "Horizon Group Realty, LLC" was not a legal entity and did not have the capacity to be sued.

33

105.    On November 23, 2009, the state court granted the Debtor's motion to dismiss "without prejudice" and granted Bonnen leave to file an amended complaint.

106.    On December 21, 2009, Bonnen filed her amended complaint naming "Horizon Realty Group, LLC, a misnomer for Horizon Group Management, LLC a/k/a Horizon Realty Group…." as defendant.

107.    On January 27, 2010, the state court dismissed the Debtor's Twitter Lawsuit with prejudice.

108.    On February 11, 2010, the Debtor filed a motion to dismiss the amended complaint contending that it was not a proper entity.

109.    On May 17, 2010, Jeffrey prepared and submitted to the "Subcommittee Exploring RLTO Amendment" of the City Council of the City of Chicago a "statement concerning the RLTO abuses taking place in Chicago" (the "Statement"). In the Statement, Jeffrey represented that "Horizon Realty Group owns and manages approximately 1,300 apartment units in Chicago." The Statement recites Jeffrey's version of the facts underlying the Class Action, including a number of vitriolic statements impugning the integrity of the plaintiff's consumer class action bar in general and Class Counsel in particular. The Statement also contains Jeffrey's estimate of potential liability in the Class Action: "We estimate the case will linger in the judicial system for another 18-36 months and her attorney will generate $100k-$300k in attorney's fees…." "The plaintiff in this case stands to gain triple damages on her security deposit (approximately $750) plus a $100 fine for the alleged RLTO

summary count, whereas her attorney stands to gain $100-$300k due to his ability to churn the case."

110.    On July 30, 2010, the state court denied the Debtor's motion to dismiss the Class Action because the wrong entity had been joined and issued its opinion on the issue.

111.    On August 26, 2010, the Debtor filed its answer and affirmative defenses to Bonnen's amended complaint.

112.    On September 24, 2010, Class Counsel sent Christoff a settlement demand, including a demand to pay Class Counsel's reasonable attorneys' fees, as approved by the state court. Jeffrey rejected this offer because it did not fix the amount of Class Counsel's attorneys' fees.

113.    On November 23, 2010, the state court entered its order striking two of the three affirmative defenses asserted by the Debtor.

114.    On December 17, 2010, the Debtor filed a motion for summary judgment in the Class Action.

115.    On July 27, 2011, the state court entered its memorandum opinion and order denying the Debtor's motion for summary judgment, effectively holding that the Debtor and the Horizon Group Enterprise had violated the RLTO.

116.    On August 17, 2011, Christoff sent a letter to Jeffrey advising him of the denial of the Debtor's motion for summary judgment, enclosing a copy of the state court's memorandum opinion, and advising that it was likely that the state court "will find in favor of plaintiff on the interest count as a matter of law because there is no

dispute that interest on plaintiff's deposit was based on the rate in the year her leases

ended." Christoff also advised Jeffrey that "[b]ased on the number of units managed

by the company and the commonality of the legal questions involved, the judge may

certify both of plaintiff's counts as class counts, upon which we will be obligated to

respond to plaintiff's class interrogatories and requests for production of documents

relating to all prospective class members."

117.    On August 26, 2011, Jeffrey responded with a memorandum to Christoff

enclosing an analysis of security deposit interest payments, and acknowledging the

underpayment of interest on security deposits for various periods. Jeffrey concluded

the memorandum by seeking "a conference call for next week with you, Sandy, Danny

and myself to discuss our options and strategy."

118.    On September 8, 2011, the state court entered its order granting Bonnen

leave to file a second amended complaint.

## D.    JEFFREY ADMITS LIABILITY ON CLASS ACTION CLAIMS AND COMMENCES A SCHEME TO DELAY, HINDER, AND DEFRAUD CREDITORS.

119.    On or about September 19, 2011, Jeffrey contacted Mel Justak, a

partner at the law firm of Reed Smith, LLP ("Reed Smith"). Reed Smith previously

provided legal advice to the Horizon Group Enterprise in connection with the

organization of Holdings, the 2009 ownership restructuring, and the *Second Amended

and Restated Management Agreement.* Jeffrey contacted Justak seeking legal advice

on the defense of the Class Action and a strategy of having the Debtor file for

bankruptcy to insulate Daniel and the Horizon Group Companies from liability in the

Class Action.

120.   On September 19, 2011, Jeffrey had an email exchange with Justak and Christoff, wherein he sought to schedule a meeting between Jeffrey, Christoff and "B/K lawyer:" Stephen Bobo ("Bobo"), a Reed Smith bankruptcy partner.

121.   On September 21, 2011, Jeffrey sent a follow up email to Bobo and Christoff attempting to firm up a meeting "to go over our options as it relates to Bonnen."

122.   On September 23, 2011, Christoff sent a settlement offer to Class Counsel that offered Bonnen $5,000 and to have Class Counsel's fees submitted to the state court upon petition to which the Debtor could "respond," in consideration of Bonnen and Class Counsel withdrawing the motion for class certification.

123.   On October 7, 2011, Jeffrey, Christoff and Bobo had a conference where they discussed the Class Action and bankruptcy options.

124.   On October 12, 2011, Bonnen and Class Counsel rejected the Debtor's September 23, 2011 settlement offer.

125.   On October 26, 2011, Jeffrey had telephone conferences with Henry Pietrkowski ("Pietrkowski"), a Reed Smith litigation partner, regarding the Class Action, and Bobo, regarding bankruptcy options.

126.   On October 27, 2011, Jeffrey sent an email to Pietrkowski confirming the prior day's telephone conference. Jeffrey copied Christoff and Bobo and attached Bonnen's amended complaint, Bonnen's September 24, 2010 settlement offer, Jeffrey's August 26, 2011 memorandum regarding security deposit interest calculations, and the Debtor's September 23, 2011 settlement offer.

127.   In this email, Jeffrey admitted that "[o]ur preliminary review of our security deposit practice seems to indicate that there were multiple periods over the past 3 years where we were incorrectly calculating the interest…. We know that we erred on these two counts [incorrect security deposit calculation and outdated RLTO summary]. Jeffrey sought advice from Reed Smith on a legal strategy based on the hope that "we are 'judgement proof' [sic]" or that "there are no reachable assets." Jeffrey further admitted that the Debtor "has no assets." "[T]he management agreement [sic] merely has a checking account with little or no funds in it. It receives proceeds from the owners as the owners are billed for services rendered in order to cover expenses. We file an annual report for the LLC but that is about it." Jeffrey's "concern is whether the plaintiff would be able to pierce the corporate veil to reach its sole owner, Danny Michael." Jeffrey sought "an honest assessment of our likelihood of the veil not being pierced." Jeffrey concluded by seeking a meeting with Christoff, Pietrkowski, and Bobo.

128.   On or about November 1, 2011, Jeffrey and Christoff met with Pietrkowski and Bobo and received advice, *inter alia*, regarding the likelihood of the piercing of the corporate veil of the Debtor and the desirability of the Debtor filing a bankruptcy case. Based upon this advice, Jeffrey did not pursue the "lie down" strategy or cause the Debtor to file a bankruptcy petition. Jeffrey caused the Debtor to continue to defend the Class Action aggressively.

129.   On November 14, 2011, the Debtor filed a motion to certify the state court's summary judgment interpretation of the RLTO for interlocutory appeal.

38

130.   On November 21, 2011, the state court entered its order striking the Debtor's first and second affirmative defenses.

131.   On December 9, 2011, the Debtor filed a motion to certify a second question for interlocutory appeal.

132.   On January 19, 2012, Jeffrey sent an email to Pietrkowski attaching Bonnen's Reply to the Debtor's motion to certify the summary judgment order for interlocutory appeal and requesting Pietrkowski' s thoughts on a footnote reference to Bonnen's discovery that the Horizon Group Enterprise had been soliciting releases from putative class members. In a reply email, Pietrkowski opined that "it is entirely possible that [the releases] will be considered void in light of the pendency of the class action." Pietrkowski also advised Jeffrey that "[g]iven how the judge has ruled against Horizon on the merits, you should seriously consider using a professional mediator to try and resolve the case on a class basis."

133.   On January 19, 2012, the state court entered its order denying the Debtor's motions to certify questions for interlocutory appeal.

134.   On January 23, 2012, Christoff sent a letter to Jeffrey advising him that the state court had denied the Debtor's motions to certify questions of law for interlocutory appeal and had set the matter for status on class certification. Christoff also advised Jeffrey that he had communicated Horizon's settlement offer to Class Counsel, which included an offer to pay "either $75,000 as and for plaintiff's attorneys' fees or an amount set by the judge upon plaintiffs filing of a fee petition."

135.    On February 8, 2012, Bonnen filed a motion to enjoin the Debtor's solicitation of releases from putative class members during the pendency of the class certification motion. Prior to this date, in an effort to "pick off" putative class members, the Horizon Group Enterprise began soliciting releases from putative class members by offering them an early refund of their security deposits, without disclosing accurate and complete information regarding the potential benefits of the Class Action.

136.    On February 21, 2012, Christoff sent a letter to Jeffrey advising of the status on various of Bonnen's motions, Bonnen's non-binding settlement term sheet providing for payment to all identified class members and a *cy pres* for unclaimed funds; that the security deposit class has 1,500 members; that the porch disclosure class has at least 1,000 members; and Class Counsel's attorneys' fee demand of $350,000. Christoff concluded that based on the change in status, "it does not appear likely that this case will be settled." Christoff requested that Jeffrey advise him of his "intentions in this matter, as well as the status of the discussions with Reed Smith."

137.    On February 27, 2012, Jeffrey sent an email to Christoff and Bobo, with a copy to Daniel, which updated Bobo on the status of the Class Action, including settlement discussions and requested an opinion on a strategy attributed to Ron E. Meisler ("Meisler"), an attorney at the law firm of Skadden Arps Slate Meagher & Flom LLP ("Skadden") and personal friend of Jeffrey, regarding sending payments of interest shortages to tenants to eliminate the class claims and then having the Debtor

40

file a bankruptcy petition in order to have the bankruptcy court determine Class Counsel's fees.

138.   On February 28, 2012, Jeffrey and Bobo had a conference wherein they discussed Meisler's bankruptcy strategy and a new strategy relating to a statute of limitations defense to avoid liability on behalf of the Horizon Group Companies.

139.   On March 7, 2012, Justak sent an email to Jeffrey wherein he referenced prior emails between Pietrkowski and Jeffrey, and Michael Richman, another Reed Smith partner, "putting together a summary of his findings on the questions you posed in your recent call with [Bobo] and [Pietrkowski]."

140.   On March 9, 2012, Jeffrey prepared and delivered a memorandum to Christoff reflecting the Debtor's analysis that up to 934 tenants with an average security deposit of $583 were underpaid during the class period.

141.   On March 12, 2012, Justak, Jeffrey, and Christoff had an email exchange regarding Reed Smith's request for information regarding its opinion whether the complaint in the Class Action could be amended to join the Horizon Group Companies as additional defendants.

142.   On or about April 11, 2012, the Debtor retained Skadden as substitute counsel to represent it in connection with the Class Action and other matters. The following Skadden attorneys provided services to the Debtor following the retention: David Pehlke ("Pehlke") (litigation associate); Albert Hogan III ("Hogan") (litigation partner); and Meisler (bankruptcy and restructuring partner).

143.  On April 11, 2012, Skadden filed its Motion for Leave to Appear and appearance as additional defense counsel for the Debtor in the Class Action. Subsequent to Skadden's appearance, Christoff had limited involvement and responsibility for the defense of the Class Action.

144.  On April 20, 2016, Jeffrey as "principal" of the Debtor executed an engagement agreement with Skadden. The engagement agreement provided that the Debtor was the client and that the engagement was "limited to representing the [Debtor] and not its individual member or employees." The engagement agreement also provides that "Mr. Daniel Michael has agreed to pay the fees, charge and disbursements incurred in connection with the Engagement to the extent that the [Debtor] does not do so within 30 days after receipt of our invoices and Mr. Daniel Michael will countersign this engagement letter memorializing such agreement." Daniel signed an acknowledgement of the engagement letter.

145.  On May 9, 2012, the parties appeared before the state court on Bonnen's motion to compel discovery and to enjoin further solicitations of releases from putative class members. The state court granted Skadden leave to appear as additional counsel for the Debtor and continued Bonnen's motions for ruling on June 22, 2012.

146.  On June 22, 2012, the state court enjoined the Horizon Group Enterprise from soliciting releases from putative class members.

147.  On September 7, 2012, the state court approved an agreed class discovery sampling procedure.

148.   On October 29, 2012, Jeffrey prepared and delivered a memorandum and analysis to Pehlke regarding the Debtor's random tenant sampling and findings of the underpayment of interest on security deposits.

149.   On December 6, 2012, Jeffrey and Pehlke had an email exchange regarding Bonnen's memorandum in support of class certification. In these emails, Pehlke advised, *inter alia*, that "[a]ll in all the risk profile has not changed very much. We still have the fact that there are a number of violations and that the court may just decide to certify based on that, rather than apply the factors and see that the rate of individual distinctions and the need for case by case review and audit is too high to warrant class treatment." Jeffrey replied that he had reviewed the memo had comments and "cannot emphasize enough how much is riding on this motion and our defense to it."

150.   On December 18, 2012, Jeffrey emailed Pehlke confirming a meeting of the same day and questioning, "how plaintiff's counsel can justify over $300,000 in attorney's fees…"

151.   On January 31, 2013, the parties appeared before the state court for argument on class certification. The state court set the cause "for ruling on class certification" on February 22, 2013.

152.   On February 22, 2013, the parties appeared before the state court for decision on the Motion for Class Certification. At this hearing, the state court orally announced that it would grant the Motion for Class Certification, ordered Bonnen to file a proposed amendment to the class definition time periods, and the "[parties]" to

appear on March 13, 2013 . . . for status on the issuance of a written opinion, as requested by defendant."

153.    On or before March 6, 2013, Jeffrey sought Skadden's opinion regarding whether the Horizon Group Companies could avoid liability in the Class Action by having the Debtor file a bankruptcy petition.

154.    On March 6, 2013, Jeffrey emailed Pehlke copies of the Amended and Restated Management Agreement and the First and Second Amendments thereto, Holdings' Operating Agreement and documents relating to Holdings ownership and valuation of the Horizon Group Enterprise, and provided a general description of the Horizon Group Enterprise.

155.    On March 6, 2013, Jeffrey separately emailed a March 21, 2012 research memorandum from Reed Smith relating to whether Bonnen could amend her complaint to join the Horizon Group Companies as defendants in the Class Action. In this email Jeffrey commented that "[i]t centered on relating-back and pulling in additional defendant after the fact, not BK as I originally thought. I would like to have a conversation with a BK attorney by next week so please let me know some referrals to speak to or people within Skadden to bounce the concept off of. . . ."

156.    On March 12, 2013, at 1:11:02 CDT, Pehlke sent Jeffrey an email discussing the status of the state court's decision to certify a class, settlement discussions, Skadden's analysis of the Horizon Group Companies liability on the Class Action claims under the Management Agreements and the bankruptcy option. With respect to the bankruptcy option, Pehlke concluded:

I have also reviewed the various Horizon operating agreements [sic] to make an initial assessment of whether a bankruptcy of the management company could shield the ownership group from liability. I don't think that this strategy will work. I believe that under the Management Agreement the Owner . . . is liable for anything owed on these suits regardless of whether the management company is bankrupt. The Management Agreement establishes a principal-agent relationship with everything done for the benefit of the principal (the Owner). The principal is responsible for obtaining insurance to protect the Manager and must indemnify the Manager against claims for damages that results from the Manger's [sic] property management activities. Under this set up, the Owner does not appear to be shielded from any liability except to the usual extent provide by principal–agent law (e.g., principal can seek indemnity for any intentional torts the manager commits.). But even under the scenario, this would involve the Owner going after the Manager for indemnification, and not a passive shield between the Owner and the Agent. I also note that the signatory for both the Management Company and the Owner on the agreement is the same individual, Daniel Michael that fact might weigh against a court distinguishing between the Owner and the Agent in a meaningful way.

157.   On May 12, 2013, Jeffrey forwarded the foregoing email to Daniel stating "Dad-read this and call me to discuss. I think we should consider settling. . . ." Daniel replied to the email stating, "We need to create the impression that we're going the bankruptcy rout [sic]. He doesn't know about the management agreement; therefore, let David mention to him tomorrow that's where we're going. Unless he comes up with a reasonable offer to settle this." Thereafter, Jeffrey and Daniel continued to exchange emails relating to scheduling a conference call with Pehlke. Pehlke later replied in an email to Jeffrey, copied to Meisler and Hogan, "Jeff, it might make sense for us to set up a day and time to talk with Danny where we on the Skadden side can walk through the various possible scenarios going forward and

what the risks/costs associated with each scenario are. This would run from various settlement scenarios to running things out on appeal. We could also go over why we think the bankruptcy option, or even signally bankruptcy to the other side, will not generate any significant cover. . . ." Upon information and belief, the Skadden attorneys subsequently had a conference call with Daniel and Jeffrey wherein they discussed their conclusions and recommendations as set forth in Pehlke's March 12, 2013 emails.

158.   On March 13, 2013, the parties appeared before the state court for a status hearing on Bonnen's amended class definition and the issuance of a written decision on class certification. The state court set a hearing for April 12, 2013 for issuance of a written opinion on class certification.

159.   On or before March 17, 2013, Jeffrey requested that Skadden perform an "exposure analysis" relating to the possible outcomes of the Class Action and the desirability of pursing a settlement of the Class Action.

160.   On March 19, 2013, Pehlke emailed a memorandum to Jeffrey that "analyzes the exposure to Horizon from the remaining possible outcomes to the *Horizon* litigation." Pehlke suggested in his cover email that the memorandum could "form the background for any conversation with you and your father regarding the current posture of the case." Based on the Debtor's own exposure analysis and information gathered during class discovery, Pehlke concluded that the maximum exposure to the Debtor was $1,160,000 on the interest class and $64,000 on the lease summary class, both without attorneys' fees. In the event that the Class Action was

litigated to final judgment in favor of the plaintiff (Scenario 1), Pehlke estimated total exposure at $1,874,000, including an estimate of Plaintiff's legal fees of $500,000. In regard to attorneys' fees under this scenario, Pehlke advised that "the court would also likely grant plaintiff's counsel a high return on the claimed fees."

161.    In the event that the Class Action were litigated to final judgment and the Debtor won on the class certification issue (Scenario 2), Pehlke estimated the total exposure at $401,260 including an estimate of Plaintiff's legal fees of $250,000. In regard to this scenario, Pehlke advised, "the primary remaining exposure in this scenario is legal fees. Judge Hall likely would award fairly significant attorney fees because she will view it as a close case litigated in good faith." Pehlke performed a risk adjustment on Scenarios 1 and 2 and estimated total exposure at $1,505,815, including an estimate of plaintiff's legal fees of $437,000.

162.    With regard to a "Settlement Near Term" (Scenario 3), Pehlke advised the "[r]ecent discussions with Plaintiff's counsel indicates that a settlement may now be possible with several features that are beneficial to Horizon: . . . Attorney fees would be decided by the court." Pehlke estimated total exposure at $568,250, including plaintiff's attorneys' fees of $350,000. In conclusion, Pehlke advised that "[s]ettlement in the near term offers good value when compared to the risks adjusted exposure of litigation to final judgment. At this point, fees for plaintiff's counsel are already essentially guaranteed at a significant amount (for the individual Bonnen claim alone) and will only continue to increase as litigation moves forward."

163.    Skadden also generally advised Daniel and Jeffrey that the bankruptcy option was "high risk" and that they should settle the case promptly to avoid increasing liability for Class Counsel's attorney's fees.

164.    On April 12, 2013, the state court entered a decision and order granting Bonnen's request to certify two classes. Pehlke emailed a copy of the opinion to Jeffrey and explained the current schedule as keeping "the case on the slow track for right now."

165.    On May 15, 2013, the Debtor filed a petition for leave to appeal the class certification order.

166.    On July 12, 2013, the Illinois Appellate Court entered its order denying the Debtor's petition for leave to appeal the class certification order.

167.    On August 30, 2013, the Illinois Appellate Court issued its mandate on its order.

E.    SETTLEMENT OF THE CLASS ACTION

168.    On August 26, 2013, Class Counsel sent a letter to Pehlke regarding the denial of the petition for interlocutory appeal of the class certification order, the "need to move the case forward by completing the class discovery process," and the potential for reopening settlement negotiations.

169.    On August 16, 2013, Pehlke forwarded to Jeffrey Class Counsel's August 26, 2013 letter regarding the status of class discovery and settlement. Pehlke further observed that "[t]hey acknowledge that fees appear to be the primary sticking point but state that they would be willing to have the Court determine the fee amount. We have discussed this type of approach before and I still think it makes sense. The cost

of settlement vs. a judgment are potentially significant and their attorneys' fees are only going to continue to escalate."

170.    On September 26, 2013, Pehlke emailed Jeffrey regarding his discussion with Class Counsel and the current bid and ask on settlement. Pehlke concluded by stating: "All in all, I think this is a good deal given where the Court was likely headed with this case."

171.    On September 30, 2013, Jeffrey emailed Pehlke with comments on the term sheet attached to the September 26, 2013, email and stated, *inter alia*, "Payment of Claims-I need at least 120 days. The amount is going to be significant. We do not have this kind of money sitting on hand. We need time to pay it out of operations." With respect to depositing the Class Award with the state court, Jeffrey proposed "a stand-by letter of credit for the balance from our bank." Finally, with respect to the attorney's fee payment, Jeffrey advised "[a]gain cash flow problem." At the time of these representations, Jeffrey knew that the Horizon Group Enterprise had no cash flow problems and could pay any awards in full immediately.

172.    On October 14, 2013, Jeffrey forwarded to Daniel, with the instruction to "[r]ead this carefully and call me to discuss and review," Pehlke's email describing an "acceptable frame work" for a settlement. In his email, Pehlke advised Jeffrey that "I think this is a favorable deal, especially given their success on class certification and how quickly they could get a merits ruling if they chose to go that route."

173.    On October 24, 2013, Jeffrey sent an email to Daniel describing the "finalized settlement term sheet," wanting "to confirm it is acceptable to you before I

have our attorney appear in court and tell the judge that the matter is settled," and advising that "[o]nce you approve, he will draft a formal settlement agreement that would need to be signed by both parties."

174.    On November 8, 2013, Jeffrey forwarded Pehlke's email of November 7, 2013, to Daniel, attaching a draft settlement agreement, commenting on certain aspects of the settlement agreement, and, in particular, advising of the requirement of posting a letter of credit.

175.    Pursuant to the Settlement Agreement, "Horizon" was required to post an irrevocable stand-by letter of credit for 75% of the possible class award, which the parties agreed was $845,000.

176.    On or about November 15, 2013, Jeffrey contacted Martin Babbo ("Babbo") a vice president at the Northern Trust Bank ("Northern Trust"), the primary bank for the Horizon Group Enterprise, regarding obtaining the letter of credit.

177.    On November 15, 2013, Babbo emailed Jeffrey a draft form of letter of credit and advised Jeffrey that he was "working on an approval of the $845,000 request."

178.    On November 18, 2013, Babbo emailed Jeffrey and Daniel that Northern Trust would require Daniel to either post his personal cash or consent to a reduction in his or other of the Horizon Group Companies' lines of credit as collateral for the Northern Trust's issuance of the letter of credit. Jeffrey replied to Babbo that he would discuss with Daniel.

179.   On November 25, 2013, Daniel executed a "Stipulation and Agreement to Settle Class Action," dated as of November 21, 2013, that resolved the Class Action (the "Settlement Agreement"). The Settlement Agreement was entered into on behalf of "Horizon," which was defined as follows:

> b.   Horizon:  Horizon shall mean Horizon Group Management, LLC (a/k/a Horizon Realty Group), Horizon Realty Group, LLC, a misnomer for Horizon Group Management, LLC, a/k/a Horizon Realty Group, Horizon Group Realty Holdings, LLC, and any other name under which Horizon Group Management, LLC operates, and any affiliates, owners, officers, parents or subsidiaries thereof.

"Horizon" represented and warranted in the Settlement Agreement that "Horizon" "has the ability and funds necessary to perform all obligations required pursuant to this Agreement." *Id.* "Horizon" further acknowledged that this representation and warranty is "material to the Plaintiff and the Class' entering into this Agreement." *Id.* The Settlement Agreement required "Horizon" to pay the following: (a) to Bonnen, the class representative, an incentive award of $5,000; (b) to each eligible member of the Security Deposit Class a payment in the amount equal to their security deposit; (c) to each eligible member of the Ordinance Summary Class $50; (d) the costs of settlement administration; and (e) the reasonable attorneys' fees and costs of Class Counsel in an amount to be determined by the state court, and payable in six monthly installments. The Settlement Agreement further provided that the attorneys' fees determined by the state court will not in any way reduce the settlement payments to class members. Finally, the Settlement Agreement provided that the state court's determination of the reasonableness of attorneys' fees and costs was binding on all parties, final, not subject to reconsideration, and not appealable.

180.   On November 25, 2013, the Debtor and Bonnen filed a Joint Motion for Preliminary Approval of Stipulation and Agreement to Settle Class Action, which attached and incorporated by reference the executed Settlement Agreement.

181.   Because of perceived complexities in issuing the letter of credit, Babbo suggested that Jeffrey consider providing a "credit reference letter" in lieu of the letter of credit required by the terms of the Settlement Agreement. Babbo made this suggestion because he believed that the Horizon Group Enterprise had assets far in excess of the $845,000. Babbo had actual knowledge that the Debtor itself did not have sufficient liquid assets or lines of credit to satisfy an $845,000 obligation. Babbo had no actual knowledge of the assets of the Debtor, did not request a balance sheet of the Debtor, and had never seen a balance sheet or a profit and loss statement for the Debtor.

182.   On December 2, 2013, the state court entered an order granting preliminary approval of the Stipulation and Agreement to Settle Class Action.

183.   On December 4, 2013, Babbo prepared a "draft" signed credit reference letter ("Credit Reference Letter"), which he emailed to Jeffrey. The Credit Reference Letter on its face was not qualified as a draft.

184.   On December 4, 2013, Jeffrey forwarded the Credit Reference Letter to Pehlke for his "blessing."

185.   The Credit Reference Letter concerning the "Judgments or Settlements involving Horizon Group Management, LLC" from the Northern Trust to the Clerk of the Circuit Court Cook County, Illinois provided in relevant part:

> Horizon Group Management, LLC is an established client of The Northern Trust Company. Please regard this letter as verification that Horizon Group Management, LLC has the means via liquid assets or lines of credit to quickly satisfy matters involving negotiated settlement or judgment equal to $845,000. Please feel free to provide this letter to those who would require the same verification.

In connection with this representation, Babbo assumed that the assets of the "Horizon Group/Michael family enterprise" were available to the Debtor to satisfy the settlement or judgment, but he did not disclose this assumption in the Credit Reference Letter. Babbo also believed that the Horizon Group Enterprise could pay "many times" the amount of the $845,000 negotiated settlement or judgment.

186.   Jeffrey knew or should have known that the representations in the Credit Reference Letter that the Debtor itself had the means via liquid assets or lines of credit to quickly satisfy matters involving a negotiated settlement or judgment equal to $845,000 were false. Jeffrey authorized Pehlke to deliver the Credit Reference Letter to the state court clerk and Class Counsel for the purposes of inducing Bonnen and Class Counsel to rely upon it and to forbear from demanding the posting of the irrevocable letter of credit as required under the Settlement Agreement.

187.   On January 14, 2014, pursuant to Jeffrey's authorization, Pehlke forwarded the Credit Reference Letter to Class Counsel and the Clerk of the Circuit Court of Cook County.

188.   Bonnen and Class Counsel relied upon the Credit Reference Letter in forbearing from demanding the posting of a letter of credit and proceeding with the state court's approval of the Settlement Agreement.

53

189.   On January 16, 2014, Class Counsel filed fee petitions seeking an aggregate of approximately $870,000 in fees and expenses.

190.   On February 4, 2014, Jeffrey sent an email to Pehlke, responding to Pehlke's email describing the fee petitions and the amounts sought, stating "Unreal. As expected I suppose."

191.   On February 14, 2014, Jeffrey emailed Pehlke regarding the status of the fee opposition brief stating: "This concerns me as it can be extensive exposure. I want to fully understand our approach and ultimate goal and expectations."

192.   On February 16, 2014, Pehlke sent an email to Jeffrey with an attached draft of the fee opposition brief and stated, *inter alia*, "The challenge here is that the case has been litigated to the hilt throughout. Lot's [sic] of Motion practice and lots of billing opportunities." On February 17, 2014, Jeffrey forwarded Pehlke's email attaching the draft fee opposition brief to Daniel.

193.   On February 18, 2014, Meisler sent an email to Jeffrey advising that he was meeting with Pehlke and Hogan to discuss the Debtor's response to the fee petitions.

194.   On or about February 21, 2014, Daniel had a conference with Pehlke to discuss "his options in the event that the ultimate decision on the fees is much higher than anticipated."

195.   On February 26, 2014, Jeffrey and Pehlke had an email exchange in which Pehlke responded to Jeffrey's questions regarding arguments in opposition to the Class Counsel fee petition wherein Pehlke noted that most of Jeffrey's proposed

arguments were not supported by law and that "it is generally accepted that it takes more time to prosecute than to defend a case," "the fact is that almost all of the motion practice is defense originated," and "[t]his type of argument only shines a light on Horizon's defense strategy as the source of all the work."

196.   On or about February 28, 2014, Jeffrey advised Pehlke that he had spoken with Daniel regarding the attorneys' fees and that "we are fine with setting the upper limit in the brief at around $185k." Jeffrey and Daniel intended that this was the amount that the Horizon Group Enterprise would be willing to pay in attorneys' fees to settle Class Counsel's fees and expenses claim pursuant to the Settlement Agreement.

197.   On March 6, 2014, Pehlke sent an email to Jeffrey regarding the draft order approving the settlement and advising Jeffrey, *inter alia*, that: "This does not affect the attorney fees-this is just to lock in the class resolution and release Horizon from the pending claims and all future claims (the main point of all this). The attorney fee piece is reserved by this for final non-appealable adjudication by the judge at a separate hearing (set for April 10, but she may also continue it to another date as I noted). This final order looks fine but let me know if you have any issues or questions."

198.   On March 13, 2014, the state court entered its final order approving the Settlement Agreement. At no time prior to the entry of the final order did the Debtor disclose to Bonnen, Class Counsel or the state court that it did not have the financial ability to perform under the Settlement Agreement.

199.   On March 20, 2014, Jude Alagna, an accounting employee of the Debtor sent an email to Northern Trust requesting, subject to Jeffrey's approval, a wire transfer from "cash operating account ending in 2969" to Sobek's account to pay the Bonnen Incentive Award of $5,000. Jeffrey approved the transfer the same day from the 2969 Operating Account.

200.   On or about June 10, 2014, the Debtor wired $40,000 to the Class Action claims administrator from the 2969 Operating Account. The Debtor did not contemporaneously record this transaction in its general ledger.

201.   On or about June 10, 2014, Jeffrey began consulting with the law firm of Goldberg Kohn, Ltd ("Goldberg Kohn") regarding representation relating to "negotiation of your collective bargaining agreement with UNITE HERE, Local 450." On June 10, 2014, Michael Sullivan, a partner at Goldberg Kohn, sent "Jeffrey E. Michael, Horizon Group Management, LLC" a proposed "Agreement for Legal Representation." The proposed agreement provided that "Our client in this matter will be Horizon Group Management, LLC, d/b/a North Shore Retirement Hotel ("Horizon")." Jeffrey executed the agreement as "COO" on behalf of the Debtor. On June 12, 2014, Sullivan agreed and accepted the agreement on behalf of Goldberg Kohn.

202.   The services provided by Goldberg Kohn were solely for the benefit of Horizon Group XXIII, LLC, one of the Horizon Group Companies, which owns a senior living facility d/b/the Merion a/k/a North Shore Retirement Hotel at 1601 West Chicago Avenue, Evanston, Illinois. On August 8, 2014, the Debtor caused a check

drawn on the 2969 Operating Account to be issued to Goldberg Kohn for $10,000. On August 15, 2014, Goldberg Kohn negotiated this check.

203.    Subsequent to its retention, Goldberg Kohn provided services in connection with the Merion/Unite Here matter. Commencing in October 2014 and continuing through at least March 2015, Goldberg Kohn sent monthly statements of its services and expenses to "Horizon Realty Group" "Attn: Jeffrey Michael, 1946 W Lawrence, Chicago, IL 60640." Neither the Debtor nor any other member of the Horizon Group Enterprise made any further payment to Goldberg Kohn.

204.    On July 8, 2014, Pehlke sent Jeffrey an email advising that the state court had not reached a decision on the attorneys' fee petitions and had continued the hearing to August 27, 2014.

205.    Pursuant to the Settlement Agreement, Horizon was to pay class member awards by July 11, 2014. If Horizon had any objections to paying a class member's claim, the Settlement Agreement required it to make an objection to paying such claim by April 12, 2014. The Debtor interposed a number of objections to certain filed claims, which claims remain currently unresolved.

206.    On August 27, 2014, the state court entered its order on Class Counsels' fee petitions (the "Fee Order"). The state court granted Class Counsels' petitions in part, and awarded Class Counsel the requested fees, less a 15% discount to account for any inefficiencies by Class Counsel and the Debtor's other criticisms. The Fee Order is a judgment in favor of Class Counsel and against the Debtor in the amount of $818,472.72 in fees and $14,982.60 in costs, for a total award of $833,455.32. Of

that amount, the state court awarded $482,228.77 to Edward T. Joyce & Associates, P.C., and $351,226.55 to the Law Offices of Jeffrey S. Sobek, P.C.

207.    On August 28, 2014, the day after the state court entered the fee award, Pehlke contacted Class Counsel and asked for wiring instructions to make the first installment payment under the Settlement Agreement and Fee Order.

208.    On August 28, 2014, Jeffrey forwarded a copy of the Fee Order to Daniel.

209.    Jeffrey believed that the Fee Order was a "joke" and that the state court judge was punishing the Horizon Group Enterprise for defending itself in the Class Action, which he regarded as a "monkey" case.

## F.    THE CHAPTER 11 BANKRUPTCY CASE, ASSET SALE, CONVERSION TO CHAPTER 7, AND TRUSTEE'S APPOINTMENT.

210.    Despite at least two separate law firms advising him that the Debtor's bankruptcy filing was not an effective option for the Horizon Group Enterprise, Jeffrey sought a bankruptcy firm referral through Meisler. On the evening of August 28, 2014, at approximately 7:00 p.m., Daniel, Jeffrey, and Meisler attended a meeting with Robert Fishman ("Fishman"), a partner at Shaw Fishman Glantz & Towbin, LLC ("Shaw Fishman"), a law firm with substantial experience and expertise in bankruptcy matters. Prior to the meeting Meisler emailed Jeffrey requesting the address of the meeting place and Jeffrey responded and commented that "Thanks for everything. I know my Dad is a tough customer. But I think we had good counsel. We got screwed by a lazy judge."

211.    After the August 28, 2014, meeting, at approximately 11:14 p.m., Meisler emailed Jeffrey advising that he was glad to have joined Jeffrey and Daniel

that night and suggesting that in addition to the documents Fishman had requested at the meeting that Jeffrey consider sending Fishman, *inter alia*, any documents that you think could "create a colorable claim (alter ego, assumption of liability/indemnification) against any other entity or person (e.g. your Dad). While there is some cost associated with his review, you are better off knowing about the problem in advance."

212.   On August 28, 2014, Jeffrey sent emails to Fishman with a copy to Meisler, *inter alia*, attaching a copy of the Debtor and Horizon Group X, LLC's organizational documents and operating agreements, a master lease form, and the amended complaint in the Class Action. Jeffrey acknowledged that the Debtor acted as landlord and as agent for the fee owners of the Properties. Jeffrey promised to provide a copy of the Debtor's current management agreement as Fishman had requested at the meeting.

213.   On August 28, 2014, Meisler sent an email to Fishman attaching the Fee Order and the Credit Reference Letter.

214.   On August 29, 2014, Jeffrey sent an email to Fishman, with a copy to Knopoff, stating that "it appears that draws to Danny from 2012, 2013, and 2014, YTD were $617,717, $469,861 and $191,195." Jeffrey attached reports of Daniel's draw account to the email. These draw reports included distributions that Daniel had received from the Debtor and other members of the Horizon Group Enterprise, but were not an accurate or complete listing of all transfers from the Debtor and the Horizon Group Enterprise to or for the benefit of Daniel and other insiders.

215.  On August 29, 2014, Jeffrey and Meisler had a further email exchange regarding the prior day's meeting where Jeffrey advised that he hoped that "the BK can be enough of a sabre to make a difference." Meisler advised Jeffrey, *inter alia*, "don't make any further dividend/distribution to your Dad from the management company. . . ." Jeffrey also confirmed to Meisler that he had discussed "potential fraudulent conveyance risk to [Daniel]" with Fishman. Notwithstanding Meisler's advice, Daniel and Jeffrey continued to cause the Debtor to make additional dividend/distributions to Daniel and Martha.

216.  On September 2, 2014, Jeffrey, Daniel, and Meisler attended a second meeting with Fishman to discuss the Debtor filing a petition under the Bankruptcy Code. Jeffrey and Daniel's intent in having the Debtor file a bankruptcy case was to delay, hinder, and defraud the unpaid class members and Class Counsel by imposing additional costs and expenses upon them and by delaying post-judgment collection proceedings against the Horizon Group Enterprise in the state court. Jeffrey and Daniel intended that the Debtor would sell its assets and assume and assign the Management Agreements to a related party for a nominal amount and assert that such transactions cut off any claims against the Horizon Group Companies and Daniel. Jeffrey and Daniel also intended to transfer all of the Debtor's financial documents and records to the related party for the purposes of frustrating any investigation into the Debtor's financial affairs. Jeffrey and Daniel intended to use the bankruptcy case for the strategic purpose of negotiating a reduction to the Fee Order.

217.    On September 3, 2014, the Debtor made an entry in its general journal recording the June 10, 2014, transfer of $40,000 from the 2969 Operating Account to the class action claims agent as a "loan" from owner to the Debtor. On September 3, 2014, Jeffrey sent an email to Fishman with a copy to Daniel confirming that the Debtor made payment from the 2969 Operating account and that he had "booked" it as a loan from owner.

218.    On September 3, 2014, Jeffrey, Daniel, Fishman, and Mark Radtke ("Radtke"), another attorney at Shaw Fishman, had a one hour telephone conference wherein they discussed "facts, issues and options" and, as reported in Jeffrey's email to Meisler the same day, "discussed the 4-5 'not so good facts' relating to BK efforts;" Daniel directing Fishman to call Joyce and "let him know that BK was coming to see what his response would be;" Daniel giving Fishman settlement authority up to $150,000; filing bankruptcy on Friday; and "the Northern Trust letter and the position it puts our banker in."

219.    On September 4, 2014, Fishman had multiple telephone conferences with Daniel and Jeffrey regarding the "situation and filing issues."

220.    On September 4, 2014, Radtke emailed Jeffrey requesting documents needed to prepare for a Chapter 11 filing by the Debtor.

221.    On September 4, 2014, Jeffrey emailed Meisler requesting thoughts on Fishman's request for a $100,000 retainer and stating, "I think it is a bit much, especially if we are just sabre rattling and given the small size of our debtor's assets, etc."

222.   On September 5, 2014, Fishman spoke with Daniel regarding the "situation."

223.   On September 5, 2014, Daniel or the Daniel Trust requested and obtained a $100,000 advance on Daniel's personal Northern Trust line of credit, loan account number XXXXXX5359, secured by Daniel's Illinois personal residence. The advance was deposited into the 4717 Operating Account and wired the same day to Shaw Fishman as its retainer for future services in connection with the Debtor's bankruptcy. The $100,000 retainer that the Debtor paid Shaw Fishman exceeded the fair value of the Debtor's assets.

224.   On September 5, 2015, Jeffrey emailed Radtke attaching a list of creditors and noting, *inter alia*, "I listed Daniel Michael and 2 Trusts. They are the borrowers on a credit line which we used to lend funds to the management company relating [to] the BK filing."

225.   On September 5, 2014, Jeffrey emailed Radtke, falsely advising him that the 2969 Operating Account always was in the name of Holdings.

226.   On September 6, 2014, pursuant to the Settlement Agreement, the first of the six Class Counsel fee installment payments was due.

227.   On or about September 7, 2014, Fishman had a telephone conference with Edward T. Joyce ("Joyce"), one of Class Counsel, and advised that payment of the Fee Order presented a "problem" for the Debtor. Joyce and Fishman agreed to a standstill agreement during negotiations relating to the payment of the amounts due under the Fee Order. Fishman also advised Joyce that he did not believe that a

Chapter 11 case would solve the Horizon Group Enterprise's problem with the Class Action, but that the clients were prepared to have the Debtor file a bankruptcy petition anyway.

228.   On September 10, 2014, Joyce sent an email to Fishman scheduling a time to discuss settlement, but expressed concern that Daniel might engage in interim conduct designed to defeat enforcement of the Fee Order.

229.   On September 11, 2014, Fishman had an email exchange with Daniel wherein Fishman sought to obtain settlement authority with respect to Fishman's anticipated settlement conference with Joyce. In response, Daniel advised Fishman that, "[m]y starting number is $300k below zero. Get his number." Fishman advised Daniel that such a "complete low ball offer" would not be helpful in resolving the matter and that Fishman would not accept such an offer if he were in Joyce's shoes. In response, Daniel replied "[t]his is my starting number, my next number is 11." Fishman replied that there would be no negotiation with such an approach and that Class Counsel would begin to attack the Horizon Group Companies and Daniel. Daniel replied:

> I respect your advise [sic] and ability as an attorney. However, if I'm going to play this hand, I'm going to be the only dealer. Mr. Joyce has to convince me not to file for bankruptcy, not the other way.
>
> * * *
>
> I'm already mentally ready to file, and fight the fight. It's your job to convince him to come up with a number that will stop me from filing. I'm dealing the cards!!!!!
>
> Daniel Michael
> Horizon realty group

230.   On September 12, 2014, Fishman responded to Joyce's September 10, 2014 email advising Joyce that Fishman would not engage in such a "play of the type [Joyce] described."

231.   On September 13, 2014, Joyce sent an email to Fishman advising that he was not worried about Fishman but that he was worried about Daniel, as Daniel had already misled Class Counsel.

232.   Between the date of Joyce's September 10, 2014 email and the petition date, Daniel transferred in excess of $170,000 from the Debtor to or for the benefit of insiders, including himself, Martha, and Jeffrey.

233.   On September 15, 2014, Meisler and Fishman had a series of email exchanges in which Fishman requested Meisler's assistance in persuading Daniel to engage in realistic settlement negotiations. Meisler replied to Fishman that he had spoken with Jeffrey, that he had advised Jeffrey to have Daniel retain personal counsel to advise him on the risks, and that he had made no progress on settlement.

234.   On September 16, 2014, Fishman had conferences with Jeffrey regarding the "situation and personal representation" and Daniel regarding the "situation."

235.   On September 16, 2014, Jeffrey forwarded an unsigned copy of the Settlement Agreement to Fishman and requested that Pehlke circulate a signed copy.

236.   On September 17, 2014, Fishman and Daniel Zazove ("Zazove"), a bankruptcy partner at the law firm of Perkins Coie, LLC, Daniel's personal attorney,

had a telephone conference and discussed a conference between Zazove and Daniel regarding settlement.

237.    On September 18, 2014, Fishman emailed Joyce advising that he had made some progress with the client and that he would call the following week after he returned from a trip.

238.    On September 24, 2014, Fishman had a telephone conference with Joyce wherein he, on behalf of the Debtor, offered $150,000 to settle Class Counsel's claim under the Fee Order. Joyce, on behalf of Class Counsel, rejected the offer. Fishman later advised Daniel and Jeffrey of the conference and the rejection of the settlement offer in an email of the same day.

239.    On September 24, 2014, Class Counsel emailed Fishman a request for certain financial information of the Debtor, which Fishman forwarded to Daniel and Jeffrey, commenting that such a request was "expected and reasonable" and that Class Counsel would not agree to a sizable discount without due diligence.

240.    On October 2, 2014, Fishman, Radtke, Class Counsel and Jeffrey had email exchanges regarding Jeffrey providing the financial information requested by Class Counsel.

241.    On October 7, 2014, Radtke sent an email to Jeffrey inquiring on the status of the production of the financial information and expressing concern that the delay in production could precipitate action by Class Counsel. Jeffrey responded that he was waiting on his accountant for some information.

242.   On October 14, 2014, Jeffrey emailed additional and revised financial information regarding the Debtor to Shaw Fishman.

243.   On October 16, 2014, Jeffrey, Daniel, Fishman, and Radtke had a conference call to discuss the financial information.

244.   On October 16, 2014, Radtke emailed Class Counsel attaching a draft form of management agreement and apologizing for the delay in producing the financial information.

245.   On October 27, 2014, the Debtor made an entry in the general journal recording the September 5, 2014 transfer of $100,000 by Daniel or the Daniel Trust to 4717 Operating Account as a loan from "owner" to the Debtor.

246.   On October 30, 2014, Radtke emailed the Debtor's balance sheet and income statement to Class Counsel.

247.   On or about November 12, 2014, Class Counsel advised Fishman that it was terminating the standstill agreement because of, *inter alia*, the Debtor's disclosures that it had made substantial transfers to or for the benefit of Daniel and his family members during the pendency of the Class Action.

248.   On November 13, 2014, Fishman had a "lengthy and detailed discussion with [Jeffrey and Daniel] re the pros and cons of filing Chapter 11."

249.   On November 13, 2014, Jeffrey emailed Radtke advising him that: "Danny confirmed that he would like us to file."

66

250.    On November 14, 2014 (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11, Title 11 of the United States Code, in the United States Bankruptcy Court for the Northern District of Illinois.

251.    The Debtor operated its business and managed its property as a debtor in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

252.    On November 19, 2014, Krystyn Jaber ("Jaber"), an accounting employee of the Debtor, sent an email to Radtke asking: "Should we be worried that it is showing dba The Merion and dba Horizon Realty Group on the bankruptcy filing?"

253.    On November 19, 2014, Jaber also sent an email to Radtke requesting instructions regarding, *inter alia*, "Country Club Payment for owner of company."

254.    On November 19, 2014, Jeffrey exchanged emails with Radtke regarding a letter to vendors announcing the Chapter 11 filing and requesting instructions regarding managing vendors and employees and vendors that were paid directly from the 2969 Operating Account.

255.    On November 20, 2014, Alagna emailed Marc Reiser ("Reiser"), another Shaw Fishman attorney, a memorandum relating to the Debtor's payroll and employee benefit plans, including health insurance. With respect to health insurance, the memorandum reflected employee contributions and an employer subsidy for non-insider employees. With respect to "Jeff Michael & Tracy Michael Wolfe," the memorandum provided "[t]he employer pays the full premium for both Jeff Michael and Tracy Michael Wolfe. Since the monthly premiums for Jeff and Tracy are

$1,405.39 each, the annual premiums for both are $33,729.36. The cost per payroll is $1,297.28 ($33,729.36/26)." Tracy is Daniel's daughter and Jeffrey's sister. Tracy had no relationship with and in particular was not an "employee" of the Debtor.

256.    On November 20, 2014, the Debtor filed motions with the Court requesting orders relating to the payment of prepetition wages and other administrative matters. In these and subsequent motions, the Debtor represented that the Fee Order was significantly higher than what it anticipated at the time it entered into the Settlement Agreement, that it did not have the ability to pay the Fee Order, and that the Chapter 11 was filed for purposes of preserving its operations and its value as a going concern. These representations were false and were known to be false by Daniel and Jeffrey. Daniel and Jeffrey were repeatedly advised by their legal counsel that the Fee Order was likely to be substantial because of their scorched earth defense tactics. Jeffrey admitted that the Fee Order award was "as expected." The Settlement Agreement required the posting of a letter of credit in an amount that the parties agreed was $845,000. The Horizon Group Enterprise had sufficient liquid assets on hand to pay the Fee Order in full. Daniel and Jeffrey knew that the Debtor's management business had no value and that the Chapter 11 was filed for the sole purpose of protecting the assets of the other members of the Horizon Group Enterprise by delaying and hindering the enforcement of the Fee Order against the Horizon Group Enterprise in order to negotiate a discount of the Fee Order through "sabre rattling." The motions did not disclose that the Debtor was paying Tracy's

health insurance premiums, even though she not an employee of the Debtor and no legal justification existed for the Debtor to make such payments.

257.   On November 20, 2014, Jeffrey exchanged a series of emails with the Shaw Fishman attorneys requesting that they "bless" a form of notice that Jeffrey wanted to send to vendors and other third parties who did business with the Horizon Group Enterprise. Jeffrey's notice contained the following provision:

> I want to emphasize that most vendors that "Horizon" does business with do business with our holding company Horizon Group Realty Holdings, LLC which is *not* a party to the bankruptcy matter and is not affected by the filing in any manner. As a point of distinction, the bankruptcy filing pertains only to the Horizon *management* company and not any of the separate and distinct companies that own the various Horizon properties or the holding company. Each of those companies are separately and adequately capitalized and will continue to do business unobstructed by the matter.

258.   Both of the Shaw Fishman attorneys expressed concern regarding Jeffrey's choice of language in the notice. Radtke responded: "This notice looks OK to me, but I am wondering if we need to scale back the paragraph where he distinguishes the various entities. Thoughts?" Fishman responded: "I share your concern. While I understand the point he wants to make, this language adds to the notion that the lines between the entities are not well understood or appreciated."

259.   On November 20, 2014, the Debtor identified Claudia Guzman-Lopez as an employee of the Debtor holding a priority wage claim and sought authority to pay such claim. On November 26, 2014, this Court authorized the Debtor to pay Guzman-Lopez's wage claim.

260.   On December 1, 2014, Debtor transferred $6,000 from the 4717 Operating Account, which had been designated as the debtor-in-possession operating account, to Martha.

261.   On or about December 7, 2014, Daniel forwarded to Babbo a link to a December 6, 2014, Crain's Chicago Business article discussing the Debtor's bankruptcy filing. Several days earlier, Daniel telephoned Babbo and advised him, *inter alia,* that the Crain's article was forthcoming, that Daniel got caught up in a suit run by a sleazy lawyer who prevailed with a large judgment for attorneys' fees of nearly 990k, awarded by one of Cook County's finest; that the affected class of tenants only received $40k; that the tenant that started it all was only shorted $1.40; that the good news was that the attorney thought he was suing Holdings, but that he had sued the management company, which is really only an office, no real assets; that judgment was structured so the attorney could not refile the case; Daniel threw the management company into bankruptcy; the lawyer has called seeking to settle for a lower amount and that once Daniel settles he will take the management company out of bankruptcy.

262.   On December 7, 2014, Babbo prepared an email summarizing this conversation with Daniel, which he forwarded with the Crain's article link to several other Northern Trust Bank officials.

263.   On December 9, 2014, the Debtor transferred $12,738.71 from the 4717 Operating Account to Citibank to pay Martha's personal credit card obligations.

264.   On or about December 10, 2014, the Debtor's attorneys were instructed *not* to include in the schedules "the entities that paid for the legal services as creditors." Daniel and Jeffrey made a conscious decision not to list Daniel or the Daniel Trust as a creditor for any amount with respect to the September 5, 2014 $100,000 transfer to the Debtor.

265.   On December 11, 2014, Patricia Fredericks, a legal assistant at Shaw Fishman, emailed Jeffrey and Alagna advising on the status of the preparation of the schedules and statement of financial affairs, *inter alia*: "[I]t has been determined that we do not need to list the entity who paid legal fees on behalf of Management."

266.   On December 11, 2014, the Debtor filed its schedules and statement of financial affairs. The Debtor failed to schedule (a) Daniel or the Daniel Trust as holding a claim for the $100,000 fee advance; (b) any amounts for compensation due from the Horizon Group Companies under the Management Agreements; and (c) a liquor license issued to the Debtor relating to the "Merion."

267.   Daniel and Jeffrey intentionally omitted the entity that "loaned" $100,000 to the Debtor to pay the attorneys' retainer for the bankruptcy case in order to conceal from the Court, the United States Trustee, and the creditors the source of the retainer and caused the Debtor's counsel to represent that the Debtor was the source of the retainer.

268.   Daniel and Jeffrey intentionally omitted claims for compensation and reimbursement due to the Debtor under the Management Agreements from the Horizon Group Companies from the schedules, despite being advised by Skadden that

the Debtor had such claims. Daniel and Jeffrey failed to disclose the Debtor's claims for compensation from the Horizon Group Companies to conceal from the Court, the United States Trustee, and creditors, valuable assets of the estate.

269.   The Debtor affirmatively represented in its statement of financial affairs that it had made no gifts or other contributions in the year preceding the bankruptcy. In the year preceding the bankruptcy filing, the Debtor had made approximately $98,000 in charitable and political contributions, which were in satisfaction of personal pledges made by Daniel and Martha or which allowed Daniel or Jeffrey to attend political events. Daniel and Jeffrey intentionally omitted to disclose the Debtor's charitable contributions and political contributions.

270.   Daniel and Jeffrey intentionally omitted the disclosure of the transfers to or the benefit of Tracy with respect to the Debtor's payment of her health insurance premiums.

271.   On December 15, 2014, at 1:30 p.m., the United States Trustee convened a Section 341 meeting of creditors. Jeffrey appeared and was examined under oath by the Assistant United States Trustee and Class Counsel. Jeffrey provided the following inaccurate and misleading testimony at the meeting: (1) Daniel had not made loans to the Debtor and was listed as a creditor solely for notice purposes; (2) the Debtor was surprised and only learned of the extent of the attorneys' fee exposure to Class Counsel after the fee petition was filed; (3) the Debtor had not sought to determine whether it had indemnification claims against the Horizon Group Companies under the Management Agreements; (4) Jeffrey's salary was $376,000 per

annum; and (5) Jeffrey had not previously discussed to whom he would be selling the assets of the Debtor.

272.   On December 15, 2014, at 2:55 p.m., (approximately 1.5 hours after the commencement of the 341 meeting) Jeffrey emailed Fishman requesting that he "reach out to Danny to pin down the sale price. I don't want to be the monkey in the middle. You can best explain how to derive and where that number should fall. We all understand the technical 0 value of the contracts. We now need a number, if any, associated with the name/goodwill/IT, etc. . . ."

273.   On December 17, 2014, Terry Hamilton, an administrator at Shaw Fishman, exchanged emails with Fishman, Radtke, and David Horwith, ("Horwith") another Shaw Fishman partner, regarding a possible conflict of interest relating to Horwith's client "Horizon Realty Group."

274.   On December 17, 2014, Radtke responded to Hamilton's conflict inquiry stating that "Horizon Group Management, LLC dba Horizon Realty Group is already a client as a chapter 11 debtor. What does this proposed engagement involve?" Horwith stated in a separate response that "Horizon Realty Group has been a client of mine on and off for 15 years. I am currently handling 2 commercial tenant evictions for them. It is my understanding that Horizon Management Group is a different entity of theirs."

275.   Fishman separately replied that "I think I am correct that this entity is the Debtor. That means we need to consider whether it needs Court authority to hire ordinary course professionals to do leasing and similar work." Horwith later replied

that "I spoke with [Radtke] about this and since the owner of the property is a different LLC, I will modify the engagement so that I am representing the actual LLC owner instead of Horizon Realty Group."

276.    On December 22, 2014, Shaw Fishman filed an amended Rule 2014 declaration disclosing Horwith's representation of certain of the Horizon Group Companies in unrelated litigation matters.

277.    On January 13, 2015, this Court entered its order authorizing Class Counsel's issuance of subpoenas for the examination and production of documents by the Debtor pursuant to Fed. R. Bankr. P. 2004, and continued Class Counsel's request for Rule 2004 proceedings with respect to other parties.

278.    On January 15, 2015, Class Counsel issued and served comprehensive subpoenas for documents on the Debtor.

279.    On January 21, 2015, the Debtor filed a response and objection to the Rule 2004 subpoenas as they related to certain third parties. The Debtor objected to the subpoena on grounds that, *inter alia*, communications between the Debtor and Jeffrey in his capacity as general counsel for the Debtor were protected by the attorney client privilege. Jeffrey did not disclose to Shaw Fishman or the Court that he was not authorized to practice law and could not act as the Debtor's general counsel.

280.    On February 11, 2015, this Court entered its order authorizing Class Counsel's issuance of subpoenas for examination and production of documents by Northern Trust.

281.    On February 13, 2015, Class Counsel issued and served comprehensive subpoenas for documents on Northern Trust.

282.    On February 14, 2015, the Debtor filed its response to Class Counsel's Rule 2004 subpoena and produced certain responsive documents. The Debtor failed to produce documents relating to the Debtor's payment of Daniel and Martha's credit cards, country club fees and charges, personal real estate taxes, and charitable and political contributions, because the Debtor asserted that it did not have possession or control of such documents. The Debtor also repeatedly represented to Class Counsel and the Trustee that it had no knowledge of whose particular Citibank credit card was being paid from the 4717 Operating Account. Jeffrey also refused to produce the Debtor's accounting records in electronic form, with the intent of delaying and impeding Class Counsel's investigation.

283.    On February 27, 2015, the Debtor filed its Motion to Authorize (1) Sale of Substantially all of its Assets Free and Clear of Liens, Claims, and Interests, (2) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (3) Related Relief (the "Sale Motion"). In the Sale Motion, the Debtor represented that: (1) "the Sale pursuant to the Purchase Agreement provides [the] estate with a premium of at least 25% over the value that a sale of the Assets to any other purchaser would produce"; (2) the Debtor was a "family owned and operated apartment leasing and property management company…."; (3) the Debtor acted "as agent for the property owners"; (4) the Debtor's personal property assets were primarily comprised of two vehicles, with an estimated value of $31,200 and office

equipment with a depreciated book value of $29,736.86, but "the actual realizable value of its office furniture and equipment is less than the depreciated book value"; and (5) "[t]he Debtor's management agreements with various property owners do not have much, if any value . . . ." and "there is no market for, or value to, the management contracts. . . ."

284.   On March 12, 2015, Class Counsel filed a motion to dismiss the Chapter 11 bankruptcy case because Daniel and Jeffrey had filed the case in bad faith to protect non-debtors and as a litigation strategy to renegotiate the Settlement Agreement.

285.   On March 31, 2015, Class Counsel made a demand upon the Debtor to bring an action to enforce its right to compensation in the form of the reimbursement of all of its expenses incurred in the operation of the Properties (including all amounts due under the Settlement Agreement) against the Horizon Group Companies. Daniel and Jeffrey failed to take any action to cause the Debtor to enforce its rights pursuant to this demand.

286.   On April 2, 2015, the Court entered its Order (the "Sale Order") authorizing the sale of substantially all of Debtor's assets and the assumption and assignment of certain executory contracts, primarily the Management Agreement with the Horizon Group Companies to HRG Management, LLC, an Illinois limited liability company of which Jeffrey is the sole member and manager. Based on Class Counsel's objection, the Court modified the Debtor's proposed Sale Order to reserve

all claims and all avoidance actions that the estate might assert against the Horizon Group Companies and the Debtor's insiders.

287.   On April 8, 2015, the Debtor filed its response to the Class Counsel's motion to dismiss the Chapter 11 case, which generally denied any improper motive in filing the bankruptcy case. In the response, the Debtor also represented that "[t]he [Class Counsel] Fee Award totaled more than four times what the Debtor paid its own counsel Skadden, and indeed presented a 'problem' for the Debtor." At the time this representation was made, Daniel and Jeffrey knew that the Debtor had not paid, or recorded as an expense, any legal fees to Skadden or Sanford Kahn, and that all such fees had been paid from 2969 Operating Account and were charged to the "Owner" ledger. Despite repeated requests by Class Counsel and the Trustee, and subpoenas to all members of the Horizon Group Enterprise, the Debtor, the Horizon Group Companies, Holdings, Daniel, and Jeffrey refused to produce to Class Counsel or the Trustee any documents evidencing the source of the payments to defense counsel in the Class Action until February 2, 2016. Jeffrey also falsely testified that he did not know the source of the payments to the Class Action defense counsel. Jeffrey had in fact personally reviewed and approved all of the legal fee invoices and designated that they be paid from the 2969 Operating Account and that they be charged to the Owner ledger. Daniel and Jeffrey also knew that the Debtor had no liquid assets other than those that the Horizon Group Enterprise transferred to it and that the Horizon Group Enterprise had sufficient assets to pay the Fee Order in full.

288.   On April 10, 2015, Northern Trust produced certain documents responsive to Class Counsel Subpoena, including the December 7, 2014 email from Babbo describing his telephone conference with Daniel regarding Daniel's bankruptcy strategy.

289.   On April 17, 2015, the Court entered its Order authorizing Class Counsel's issuance of subpoenas for examination of and production of documents by Daniel, Martha, Jeffrey, the Horizon Group Companies, and Skadden.

290.   On April 24, 2015, Class Counsel sent an email to the attorney for Northern Trust requesting a supplemental production of documents pursuant to the outstanding subpoena relating to a $100,000 deposit to the 4717 Operating Account, which was described as "09-05 Note Proceeds Loan Account #XXXXXX5359" in the September 2014 account statement.

291.   On April 28, 2015, Northern Trust's attorney sent an email to Zazove advising of the request, because "the loan account referenced is in the name of Daniel Michael." Daniel's personal attorneys forwarded Class Counsel and the Northern Trust attorney's emails to Jeffrey who explained that the lines of credit were all Daniel's personal lines but were used for business purposes. Zazove advised, "Class Counsel will try to make a case for veil piercing based upon the use of personal funds to pay business obligations." Jeffrey admitted, "I see the optical problem with this…"

292.   On April 30, 2015, Jeffrey's newly organized entity, HRG Management, LLC, closed on the purchase of the Debtor's assets and caused $75,000 to be deposited into the 4717 Operating Account.

293.   On May 12, 2015, (the "Conversion Date") the Court entered its order converting the Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code.

294.   On May 12, 2015, the Trustee was appointed, qualified, and has continued to serve as trustee for the estate of the Debtor.

295.   On the Conversion Date the balance in the 4717 Operating Account was $50,841.63.

296.   Subsequent to the Trustee's appointment, Jeffrey and Daniel delayed turning over the funds in and refused to provide the Trustee with access to the 4717 Operating Account.

297.   Despite the Trustee's appointment and the termination of Daniel and Jeffrey's authority over the 4717 Operating Account, Daniel and Jeffrey deposited approximately $190,000 into and caused approximately $190,000 to be disbursed from the 4717 Operating Account *after* the Conversion Date.

298.   On July 10, 2015, the Debtor filed its final report and account. The final report and account reflects that, except for the $75,000 in sales proceeds, the Debtor's revenues and expenses for the entire period of the Chapter 11 case were approximately equal. The final report failed to disclose the receipts and disbursements of approximately $190,000 through the 4717 Operating Account on May 27 and 28, 2014.

299.   On August 7, 2015, the Debtor delivered to the Trustee copies of the Debtor's bank statements for the 4717 Operating Account for January through July

31, 2015. The statements disclosed that subsequent to the Trustee's appointment, Daniel and Jeffrey disbursed in excess of $190,000 from 4717 Operating Account.

300.   On August 11, 2015, Daniel, Martha, Jeffrey, the Horizon Group Companies, and Holdings filed their response to Class Counsel's subpoenas generally representing that they or the Debtor had produced or would produce documents responsive to certain requests and generally objecting to requests seeking broader discovery with respect to the Horizon Group Enterprise as being beyond the scope of Rule 2004. Daniel, Martha, Jeffrey, the Horizon Group Companies and Holdings withheld numerous documents and otherwise failed to comply with their duties under the subpoenas.

301.   On August 12, 2015, the Court entered its order authorizing the Trustee to intervene in all pending Rule 2004 proceedings initiated by Class Counsel.

302.   On August 13, 2015, the Court entered its order designating Daniel as the individual to perform the duties of the Debtor and to appear for examination on behalf of the Debtor.

303.   On August 13, 2015, the Court entered its order compelling the Debtor to surrender and turn over all property of the estate and recorded information relating to property of the estate that was in the Debtor's possession to the Trustee.

304.   Although the Debtor listed Goldberg Kohn as an unsecured creditor holding a claim against the estate in its schedules, the Debtor did not list it on the creditor matrix and it did not receive actual notice of the Debtor's bankruptcy petition.

305.   On August 14, 2015, after it indirectly learned of the bankruptcy, Goldberg Kohn filed a proof of claim for its prepetition services. On August 24, 2015, Goldberg Kohn filed a motion for relief from stay to set-off its prepetition claim against its retainer and a motion for the allowance of $17,700 of post-petition fees as an administrative expense. Goldberg Kohn's motion represented that the services provided were in the ordinary course of business of the Debtor, were unconnected to the administration of the bankruptcy estate, and that such services benefited the estate.

306.   On August 20, 2015, Holdings filed two proofs of claim in the bankruptcy case: (1) relating to the $40,000 transfer to the Class Action claims administrator from the 2969 Operating Account and (2) relating to Daniel and the Daniel Trust's $100,000 transfer to the 4717 Operating Account that was subsequently transferred to Shaw Fishman as a retainer from the 4717 Operating Account.

307.   On September 15, 2015, Attorneys for the Debtor, the Horizon Group Companies, and Jeffrey, Michael, and Martha, appeared at the hearing and did not object to either Goldberg Kohn motion. On September 15, 2015, this Court entered orders allowing Goldberg Kohn's prepetition claim and its post-petition claim as a Chapter 11 administrative expense.

308.   Upon information and belief, Goldberg Kohn has continued to provide services to the Horizon Group Enterprise in connection with the Unite Here matter.

309.    The Horizon Group Enterprise and Horizon Group XXIII, LLC have failed and refused to reimburse the Trustee for the expense of Goldberg Kohn's representation.

310.    On September 17, 2015, the Trustee sent an email to Reed Smith requesting the turnover of documents relating to any representation of the Debtor and the Debtor's "discussions with Reed Smith" as referenced in Christoff's February 21, 2012, letter to Jeffrey.

311.    On September 29, 2015, Daniel appeared as the Debtor's representative for the Section 341 meeting of creditors and for a Rule 2004 examination. Daniel provided inaccurate and misleading testimony at this examination, including (a) that he was not involved in the conduct of the defense of or the negotiation of the settlement of the Class Action; (b) that he had been told it would only cost $20,000 to settle the Class Action; (c) that all of the personal credit cards being paid by the Debtor were his credit cards; (d) that the only recollection that he had of the September 3, 2014 meeting with the Shaw Fishman attorneys was that Fishman told him that the Debtor should file a bankruptcy petition; (e) that the Debtor and he had produced all documents responsive to the Class Counsel and Trustee's subpoenas; (f) that the only services Reed Smith provided to the Debtor were in connection with the drafting of the Management Agreements and that he could not recall what Reed Smith might have done for the Horizon Group Companies; (g) that Daniel "rarely" discussed the Class Action with Jeffrey, not even once a year; (h) that Daniel never

reviewed the Settlement Agreement; and (i) that Jeffrey never told Daniel the amount that Class Counsel was seeking in the fee petition.

312.   On November 4, 2015, Daniel and Martha produced documents relating to certain of their personal charitable contributions that had been paid by the Debtor. This production was not a complete production of documents responsive to the subpoenas as reflected by the third party production by certain of the charitable donees.

313.   On November 11, 2015, Horizon Group XXI, LLC (defined in the complaint as "Horizon") filed a complaint in the Circuit Court of Cook County against Claudia Guzman-Lopez relating to an embezzlement scheme. The Complaint alleges that "Guzman-Lopez was a property assistant working for Horizon [Group XXI, LLC] from July 2009 until her resignation in July 2015." "Guzman-Lopez confessed that while employed at Horizon [Group XXI, LLC], she had accepted cash and improperly signed and cashed checks for her own benefit."

314.   On November 12, 2015, Jeffrey appeared for a Rule 2004 examination. Jeffrey provided inaccurate and misleading testimony at this examination, including: (a) that he did not recall the subject matter of his discussions with Reed Smith referenced in Christoff's February 21, 2011 letter; (b) that the Debtor's previously filed schedules and statement of financial affairs were accurate; (c) that he did not know the source of payments to the Class Action defense counsel; (d) that the payment of the Class Action defense counsel should have been recorded as an expense of the Debtor and that he did not know why it had been recorded as an expense of the

Horizon Group Companies; (e) that he had not discussed a bankruptcy filing by the Debtor with Meisler in March of 2012; (f) that he did not recall the intent or what caused the Debtor and the Horizon Group Companies to enter into the Second Amended and Restated Management Agreement; and (g) that he had no idea whether the 2969 Operating Account had previously been the Debtor's account.

315.    The following day, on November 13, 2015, pursuant to the Trustee's Section 542 turnover demand, Reed Smith produced documents to the Trustee that described Jeffrey's "discussions" with Reed Smith regarding (a) the Class Action; (b) filing a bankruptcy to limit the Horizon Group Enterprise's exposure in the Class Action; (c) the strength of Bonnen and Class Counsel's claim for piercing the corporate veil; and (d) his discussions with Meisler in March 2012 regarding the filing of a strategic bankruptcy. Daniel and Jeffrey failed to produce the Reed Smith documents to Shaw Fishman, failed to produce them in response to subpoenas and this Court's turnover order, and otherwise attempted to conceal such documents from the Trustee.

316.    Based on the Debtor, Daniel, and Martha's continuing representations that they had no documents in their possession or control responsive to their subpoenas, the Trustee issued subpoenas to Addison Reserve Country Club, Inc. ("Addison Reserve"), Daniel and Martha's Florida country club. On November 23, 2015, Addison Reserve produced documents relating to the Debtor's payment of approximately $115,000 of Daniel and Martha's fees and expenses at Addison Reserve.

317.    On December 8, 2015, the Northern Trust produced to the Trustee pursuant to subpoena documents relating to the creation of (and change of name of owner of) the 2969 Operating Account and the 4717 Operating Account.

318.    On December 11, 2015, after a nearly year-long delay, the Debtor produced to the Trustee copies of the account statements for the 2969 Operating Account prior to November 2011. These 2969 Operating Account statements reflect the integrated nature of the Horizon Group Enterprise, the complete commingling of the business assets of the Debtor and the Horizon Group Companies, and Daniel's practice of using the Horizon Group Enterprise's assets to pay Daniel and Martha's personal living expenses.

319.    Based on Daniel's continuing representations that he had no documents responsive to the Trustee's subpoena, the Trustee issued subpoenas to Citibank for Daniel's credit card statements. On December 17, 2015, after the Court denied Daniel's motions to quash, Citibank produced credit card statements for Daniel's accounts. Although the statements reflected significant activity of Daniel and the Horizon Group Enterprise, including Daniel's comingling of business and personal expenses, the accounts were not the accounts that the Debtor was paying from the 4717 Operating Account. Even so, the Debtor and Daniel continued to deny knowledge of the identity of the holder of the credit card that was being paid by the Debtor from the 4717 Operating Account.

320.    On February 10, 2016, Jaber, the Debtor's junior accountant, appeared for a Rule 2004 examination and testified that all invoices and statements paid by

the Debtor and related checks were retained and stored on-site for approximately two years and later moved to an off-site storage facility; but, that she was not requested to perform a document search in response to Class Counsel and the Trustee's subpoenas. Jaber also testified that Jeffrey's handwriting appeared on the Class Action Defense counsel invoices and that Jeffrey had approved the payment of such invoices from the 2969 Operating Account.

321.    Based on Martha's continuing representation that she had no documents in her possession and control responsive to the subpoena, the Trustee issued a subpoena to Citibank for Martha's credit card accounts. On March 9, 2016, after the Court denied Martha's motion to quash, Citibank produced credit card statements for Martha's accounts, all of which were paid by the Debtor from the 4717 Operating Account. These statements reflected charges entirely for personal expenses, primarily meals, entertainment, travel, and luxury goods, in excess of $1 million that were paid by the Debtor during the pendency of the Class Action.

322.    On June 3, 2016, Reed Smith, Daniel, Jeffrey, Martha, the Horizon Group Companies, and Holdings submitted correspondence and a privilege log to the Trustee describing approximately 240 emails and other documents exchanged among and between Jeffrey and Reed Smith attorneys over the Debtor's email system that occurred between September of 2011 and May of 2012 and which related to, *inter alia*, "legal advice to members of the Michael family and/or non-debtor entities relating to the Bonnen litigation," the period during which Jeffrey testified that he could not recall what he was discussing with Reed Smith. The correspondence also

acknowledged that the respondents had "identified certain documents that are responsive to the Subpoenas and over which no claim of privilege was asserted."

323.    On June 6, 2016, Skadden made a supplemental production pursuant to the Trustee's subpoena. This production included numerous email communications and other documents that were in the possession and control of the Debtor, Daniel and Jeffrey, which they had not produced pursuant to prior subpoenas and the Court's order compelling turnover of the Debtor's recorded information.

## COUNT I – FRAUDULENT TRANSFER - 11 U.S.C. § 548(a)

324.    The Trustee repeats and realleges paragraphs 1 through 323 of this Complaint as though fully set forth herein.

325.    The Debtor made transfers of its property to the Defendant, as described in page 7 of Exhibit A and paragraphs 2 and 82 of this Complaint, which occurred on or within two years of the Petition Date, with the actual intent to hinder, delay, or defraud entities to which the Debtor was or became, on or after the dates such transfers were made, indebted.

326.    With respect to the transfers:

(1)    the transfers were to, or for the benefit of, insiders;

(2)    the transfers were concealed in most instances by having the Debtor make the transfers to third party creditors of the insiders;

(3)    before the transfers were made, the Debtor had been sued or threatened with suit;

(4)    the transfers were of substantially all of the Debtor's assets;

(5)     the Debtor removed or concealed assets;

(6)     the value of the consideration received by the Debtor was not reasonably equivalent to the value of the assets transferred;

(7)     the Debtor was insolvent or became insolvent shortly after the transfers were made; and

(8)     the transfers occurred shortly before or shortly after a substantial debt was incurred.

WHEREFORE, the Trustee prays that this Court enter judgment:

A.     Avoiding the transfers of property made by the Debtor to the Defendant and awarding the Trustee recovery of an amount equal to the value of such property from the Defendant pursuant to 11 U.S.C. §§ 548 and 550;

B.     Awarding prejudgment interest on such amounts and costs; and

C.     Awarding such other relief as is appropriate.

## COUNT II– FRAUDULENT TRANSFER
## 11 U.S.C. § 548(b)

327.   Trustee repeats and realleges paragraphs 1 through 323 of this Complaint as though fully set forth herein.

328.   The Debtor made certain of the transfers of property to the Defendant, as described in page 7 of Exhibit A and paragraphs 2 and 82 of this Complaint, which occurred on or within two years of the Petition Date.

329.   The Debtor received less than a reasonably equivalent value in exchange for such transfers.

330.    The Debtor was insolvent on the date that such transfers were made, or became insolvent as a result of such transfers; the Debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; or the Debtor intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

WHEREFORE, the Trustee prays that this Court enter judgment:

A.    Avoiding the transfers of property made by the Debtor to the Defendant and awarding the Trustee recovery of an amount equal to the value of such property from the Defendant pursuant to 11 U.S.C. §§ 548 and 550;

B.    Awarding prejudgment interest on such amounts and costs; and

C.    Awarding such other relief as is appropriate.

Dated: July 15, 2016                          ANDREW J. MAXWELL, TRUSTEE

                                              By: /s/ Paul M. Bauch
                                                     One of His Attorneys

Paul M. Bauch (ARDC #6196619)
Kenneth A. Michaels Jr. (ARDC #6185885)
Carolina Y. Sales (ARDC #6287277)
BAUCH & MICHAELS, LLC
53 W. Jackson Blvd., Suite 1115
Chicago, Illinois 60604
(312) 588-5000
Fax (312) 427-5709
pbauch@bauch-michaels.com